# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 21, 2014 Session

## STATE OF TENNESSEE v. LEMARICUS DEVALL DAVIDSON

**Appeal from the Criminal Court for Knox County**
**No. 86216B      Walter C. Kurtz, Judge[1]**

**No. E2013-00394-CCA-R3-DD - Filed March 10, 2015**

The defendant, Lemaricus Devall Davidson, appeals the Knox County Criminal Court jury convictions of two counts of first degree murder, two counts of especially aggravated robbery, two counts of especially aggravated kidnapping, three counts of aggravated rape, and one count of facilitation of aggravated rape that he received for his role in the January 2007 deaths of C.N. and C.C.[2]  The defendant claims that:  the trial court erred by refusing to suppress evidence obtained during the searches of his residence, his statements to the police following his arrest, and evidence obtained during searches of his person; the trial court erred by admitting into evidence postmortem photographs of the victims; the trial court should have excluded testimony and evidence regarding fingerprint examination and ballistics testing; the trial court erred by permitting courtroom spectators to wear buttons emblazoned with photographs of the victims during the guilt phase; the State violated his constitutional rights by intercepting and examining privileged communications to and from his attorneys; structural constitutional error occasioned by the out-of-court behavior of the trial judge entitles him to a new trial; the second successor trial judge erred by concluding that he could fulfill the statutory duty of thirteenth-juror review; the evidence was insufficient to support his convictions; errors related to the presentment require dismissal of the charges; the trial court erred by permitting jurors to submit questions for the witnesses; the trial court erred by allowing spectators to remain in the courtroom while jurors reviewed the defendant's videotaped statement as part of their deliberations; the trial court should have dismissed the presentment due to constitutional deficiencies in the jury venire; the trial court erred by refusing to allow him to present evidence of the economic costs associated with the

---

[1]Judge Richard Baumgartner presided over the defendant's case until he resigned in March 2011. Our supreme court appointed Senior Judge Jon Kerry Blackwood to take over, and he remained on the case until he recused himself.  Our supreme court then appointed Judge Walter B. Kurtz to preside over the case.

[2]It is the policy of this court to refer to the victims of sexual assault by their initials.

implementation of the death penalty; and the trial court erred by excusing those jurors who were not "death qualified." The defendant also raises a number of challenges to the death penalty in general and its application in this case specifically. Because we conclude that no reversible error attends the convictions or sentences in this case and because it is our view, after a mandatory review, that the sentences of death imposed in this case were not disproportionate, we affirm the judgments of the trial court. We detect, however, clerical errors that require that the case be remanded for entry of corrected judgment forms.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed and Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

David M. Eldridge and Douglas A. Trant, Knoxville, Tennessee, for the appellant, Lemaricus Devall Davidson.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, Assistant District Attorney General; and Leland Price and Takisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury charged the defendant, George Thomas, Letalvis Cobbins[3], and Vanessa Coleman with eight counts of the first degree felony murder of C.N., eight counts of the first degree felony murder of C.C., one count of the first degree premeditated murder of C.N., one count of the first degree premeditated murder of C.C., one count of the especially aggravated robbery of C.N., one count of the especially aggravated robbery of C.C., two counts of the especially aggravated kidnapping of C.N., two counts of the especially aggravated kidnapping of C.C., five counts of the aggravated rape of C.N., 15 counts of the aggravated rape of C.C., one count of theft of property from C.C. valued at $10,000 or more but less than $60,000, and one count of theft of property from C.N. valued at less than $500.

The defendant's case proceeded to trial in October 2009, and the evidence adduced at that trial established that on December 28, 2006, Stacy Lawson, the girlfriend of Mr. Thomas, drove Mr. Thomas, Mr. Cobbins, and Ms. Coleman from Kentucky to the defendant's residence at 2316 Chipman Street ("Chipman Street residence") in Knoxville. Ms. Lawson returned to Kentucky on January 2, 2007, but the others remained at the

_____

[3]Mr. Cobbins is the half-brother of the defendant.

Chipman Street residence. Daphne Sutton, who was the defendant's girlfriend at the time and who had been living in the Chipman Street residence with the defendant, moved out of the Chipman Street residence on January 5, 2007. Mr. Thomas, Mr. Cobbins, Ms. Coleman, and the defendant remained at the Chipman Street residence.

On Saturday, January 6, 2007, C.N. and C.C. made plans to meet at the Washington Ridge Apartments in Knoxville, go out to dinner, and then join friends at a party. When the couple did not arrive at the party by 10:00 p.m., their friends called and sent messages to the victims' cellular telephones. At approximately 11:00 p.m., two of those friends drove to the Washington Ridge Apartments, where C.C. had last been seen, and discovered C.N.'s truck parked in the parking lot. C.C.'s silver Toyota 4Runner was gone, which struck the friends as odd because the couple typically traveled in C.N.'s truck. Further attempts throughout the night to contact C.N. and C.C. via telephone proved unsuccessful.

At approximately 12:30 a.m. on Sunday, January 7, 2007, C.C. telephoned her parents and told her father that she would be home later after watching a movie. C.C.'s mother stayed up to await her daughter's arrival. When C.C. did not arrive home by 3:30 a.m., C.C.'s mother called C.C.'s cellular telephone but received no answer. C.C.'s mother fell asleep at approximately 6:00 a.m., but when she awoke a few hours later, she resumed calling C.C.'s cellular telephone.

Although they had initially assumed that C.N. had spent the night of January 6, 2007, at a friend's house, C.N.'s parents became concerned for his safety after C.C.'s mother informed them that C.C. had not arrived for work. They checked the local hospitals and stayed by the telephone throughout the day and evening but heard no word of the whereabouts of either victim.

At 12:20 p.m. on Sunday, January 7, a train engineer with Norfolk Southern Corporation discovered the badly burned and partially nude body of a 20- to 25-year-old man near the train tracks at Cherry Street. At approximately 8:30 a.m. on the following morning, the body was identified as C.N.

When C.C. did not arrive for work as scheduled on the afternoon of January 7, 2007, her family began to search for her. Utilizing information from C.C.'s cellular telephone service carrier, they learned that the telephone had last been used at approximately 12:30 a.m. in the Cherry Street area of Knoxville. Family and friends, with the help of a friend who was a former member of law enforcement, organized a grid search of the Cherry Street area. At 1:30 a.m. on Monday, January 8, 2007, members of the search party discovered C.C.'s silver Toyota 4Runner abandoned at the corner of Chipman and Glider Streets. Knoxville Police Department ("KPD") Senior Evidence Technician Daniel

Crenshaw arrived approximately one-half hour later and performed the preliminary processing of C.C.'s vehicle at the scene. He photographed the vehicle and dusted the exterior for fingerprints before having the car towed to the police impound lot. No further processing was conducted on the vehicle until later that evening.

Witnesses who worked or lived near the Chipman Street residence testified that a lot of activity occurred near the residence shortly after midnight on Sunday, January 7, 2007. One witness recalled having seen four black individuals in a Toyota 4Runner at approximately 12:30 a.m., which vehicle the witness saw parked near the railroad tracks later that morning. Another witness heard "three loud pops" at approximately 1:45 a.m. on Sunday morning. A third witness saw smoke rising from the area of the railroad tracks at 7:45 a.m. on January 7, 2007.

When Mr. Crenshaw returned to work at 11:00 p.m. on Monday, January 8, he collected a bank envelope from the back seat of C.C.'s 4Runner and processed it for fingerprints. At 2:45 a.m. on Tuesday, January 9, Mr. Crenshaw identified the fingerprint he discovered on the envelope as belonging to the defendant. He then determined the defendant's address to be 2316 Chipman Street. Mr. Crenshaw notified Investigator Todd Childress of the preliminary fingerprint identification. Tim Schade, another KPD evidence technician, verified the fingerprint identification at approximately 8:00 a.m. on January 9.

At 12:53 p.m. on Tuesday, January 9, 2007, Investigator Childress obtained a warrant to search the Chipman Street residence. Officers entered the residence at 1:39 p.m. and three minutes later, while securing the scene, discovered C.C.'s body in a large trash can in the kitchen. Doctor Darinka Mileusnic-Polchan, Knox County Medical Examiner, arrived at the residence at 2:04 p.m. and directed that the trash can with C.C.'s body inside it be transported to the medical examiner's office.

On Thursday, January 11, 2007, officers arrested the defendant at an abandoned house in the Western Heights area of Knoxville. Following an admonition and waiver of rights, the defendant gave a two-and-one-half-hour statement concerning the robbery, kidnapping, rape, and murder of the victims. Although the defendant initially denied being present at the Chipman Street residence during the preceding weekend, he ultimately admitted that he had some interaction with C.C. but denied having had sex with her. He specifically denied having met either of the victims before January 6, 2007.

Special Agent Robert Watson of the Tennessee State Fire Marshal's Office detected the presence of an accelerant in the soil near C.N.'s body. Agent Watson gathered samples of the soil, and testing performed by the Tennessee Bureau of Investigation ("TBI") confirmed the presence of gasoline in the soil samples.

Mr. Crenshaw's analysis of items recovered during the search of the Chipman Street residence revealed the defendant's fingerprints on three of the five trash bags that had contained C.C.'s body. Witnesses identified other items found in the home – articles of clothing, notes, documents, the contents of a purse, and a personalized iPod – as belonging to C.C. Additionally, C.N.'s mother identified a pair of Nike Shox shoes as those purchased by C.N. six weeks before his death. Various associates of the defendant testified that they had received from the defendant clothing items later identified as belonging to C.C.

Witnesses testified that the defendant had possessed the guns discovered during the search of the Chipman Street residence. Ballistics testing to match those guns with bullets recovered from C.N.'s body produced inconclusive results.

Deoxyribonucleic acid ("DNA") analysis established the presence of the defendant's semen in C.C.'s vagina and rectum and on her blue jeans. Mr. Cobbins' DNA was found in C.C.'s mouth and on her blue jeans, sweater, and tank top. DNA testing of the floral fabric used to bind C.C. established the presence of DNA belonging to C.C., Mr. Cobbins, and Ms. Coleman. Forensic testing performed on the anal swab conducted during C.N.'s autopsy established the presence of semen, but the only DNA profile identified in that sample belonged to C.N.

Doctor Mileusnic-Polchan performed an autopsy of both victims. C.N. had been bound at the ankles by a belt and a strip of fabric and at the wrists with "something like a shoelace." He had also been blindfolded and gagged, and his head had been wrapped in a sweatshirt. Based upon the location of unburned skin on his body, she determined that he had been wrapped in "some sort of comforter and placed face up" before being set on fire. C.N. suffered three gunshot wounds. A contact gunshot wound to his head severed his brain stem, causing "instantaneous death." A gunshot wound "between the back of the neck and the shoulders" did not "cause any major damage." Another gunshot wound entered C.N.'s back and traveled "steeply upward" where it caused severe damage to his spinal chord. Lacerations, abrasions, and bruising in the area of C.N.'s anus indicated anal penetration that occurred before his death. Dirt and soil on C.N.'s feet indicated that he had been walking barefoot before his death. C.N.'s blood tested positive for the presence of amphetamines, alcohol, and marijuana.

C.C.'s body was inside the trash can, and strips of fabric had been used to bind her body into a fetal position. A small plastic bag had been tied around her head, and then her body had been placed in five different large garbage bags before being placed into the trash can. She was nude from the waist down. The autopsy findings indicated that C.C. died inside the trash can of a combination of positional asphyxiation due to the position of her body, suffocation due to the plastic bag on her face, and mechanical asphyxiation due to

being placed in the confined space of the trash can with bedding. Blood and other fluids were smeared around her abdomen and upper chest. She suffered "excoriations" – "like a carpet burn" – to her lower back and upper buttocks. C.C.'s anogenital region sustained "tremendous damage." She had tears to her vagina and rectum as well as severe blunt force trauma to the area. Doctor Mileusnic-Polchan explained,

> [T]he whole area was just a blunt-force trauma which is bruising, contusion, and abrasions, and lacerations. . . . The depth of the injury was so grave that there's no way that just a regular rape could – could inflict this. . . . [T]his is an object coming in contact with the body to inflict the serious injury of this kind.

C.C. also suffered blunt force trauma to her head, contusions on her shoulders, bruising on her arms, and a small cut on her hand. She suffered a torn frenulum, which was likely caused by something being forcefully put into her mouth. C.C.'s blood was negative for drugs and alcohol.

Based upon this evidence, the jury found the defendant guilty of 16 counts of felony murder, two counts of premeditated murder, two counts of especially aggravated robbery, four counts of aggravated kidnapping, nine counts of the aggravated rape of C.C., three counts of facilitation of the aggravated rape of C.N., one count of theft of property valued at $10,000 or more but less than $60,000, and one count of theft of property valued at less than $500. The trial court merged the jury verdicts of felony murder and premeditated murder into one count of felony murder and one count of premeditated murder for each victim and proceeded to the penalty phase of the trial.[4]

During the penalty phase, the State presented evidence of the defendant's prior conviction of aggravated robbery in support of the prior violent felony aggravating circumstance. C.N.'s sister, mother, and father testified concerning the impact of C.N.'s death on their family. Similarly, C.C.'s brother and mother testified concerning the impact of C.C.'s death on their family.

The defendant presented evidence through the testimony of a mitigation specialist, Rosalind Andrews, concerning the multi-generational history of "violence, incest, and alcohol abuse" that permeated the defendant's family. Family members testified that the defendant's mother suffered a history of mental illness, drug addiction, and prostitution.

---

[4]Following the jury verdicts, the State dismissed those counts charging the defendant with the felony murder of C.N. during the rape of C.N. and the felony murder of C.C. during the rape of C.N.

-6-

Alice Rhea testified that she and her husband had operated a group home for troubled teenaged boys and that the defendant had lived in the group home for some time. She recalled that the defendant stayed longer than was customary because his placement in the home had been "forgotten." Ms. Rhea introduced the defendant to the Rudd family in hopes that they might remove the defendant from bad influences in Memphis. She recalled that the defendant "had such potential. He was a thrown away child."

Members of the Rudd family testified that the defendant lived with them for approximately one-and-one-half years while still in high school and before his conviction of aggravated robbery. The Rudds testified that the defendant was helpful and respectful and excelled as an athlete while enrolled in a Jackson private school with their son. The defendant was asked to leave their home, however, when the Rudds discovered that he had been using marijuana. The Rudds asked that the jury be "merciful enough to let [the defendant] live."

Doctor Peter Brown testified that the defendant's early childhood presented all the psychological risk factors for future violent behavior, creating a "statistical inevitability" that he would engage in violent behavior as an adult. Doctor Brown testified that the defendant was of above-average intelligence and that he presented a low risk for violence in a structured setting. He opined, however, that "all bets are off" concerning the defendant's violent behavior when under the influence of drugs or alcohol.

Based upon the proof presented during both the guilt and penalty phases of the trial, the jury found that the murders were "especially heinous, atrocious, or cruel, in that" the murders "involved torture or serious physical abuse beyond that necessary to produce death," *see* T.C.A. § 39-13-204(i)(5); that the murders were "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," *see id.* § 39-13-204(i)(6); and that the murders were "knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit" an aggravated robbery, aggravated kidnapping, aggravated rape, or theft, *see id.* § 39-13-204(i)(7). Additionally, with respect to the murder of C.N., the jury found that the defendant "knowingly mutilated the body of the victim after death." *See id.* § 39-13-204(i)(13). The jury further determined that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt and imposed sentences of death for each conviction of first degree murder. The trial court then further merged offenses and sentences into two convictions of first degree murder and two sentences of death.

Following a sentencing hearing, the trial court merged the two jury verdicts of especially aggravated kidnapping of C.N. into one conviction of especially aggravated

kidnapping and imposed a sentence of 40 years for that conviction. The trial court also merged the jury verdicts of facilitation of aggravated rape of C.N. into a single conviction and imposed a sentence of 20 years. The court merged the jury verdict of theft of property valued at $500 or less into the conviction of the especially aggravated robbery of C.N. and imposed a sentence of 40 years. The court ordered that the sentences be served concurrently with one another and to the sentence of death imposed for the murder of C.N.[5]

The trial court merged the jury verdicts of the especially aggravated kidnapping of C.C. into a single conviction of especially aggravated kidnapping and imposed a sentence of 40 years. The court merged the nine convictions of the aggravated rape of C.C. into three convictions of the aggravated rape of C.C. and imposed sentences of 40 years for each conviction. The court merged the conviction of the theft of property valued at $10,000 or more but less than $60,000 into the conviction of the aggravated robbery of C.C. and imposed a 40-year sentence. The court ordered that the sentences be served concurrently to one another and concurrently to the sentence of death imposed for the murder of C.C.[6] The trial court ordered that the sentences of death for the murders of the victims be served consecutively.

In a timely motion for new trial, the defendant alleged 58 separate grounds for relief. Before the motion could be heard, however, the trial judge "resigned from the bench after pleading guilty to one count of official misconduct." *State v. Letalvis Cobbins, Lemaricus Davidson, and George Thomas*, No. E2012-00448-SC-R10-DD (Tenn. May 24, 2012) (Order) ("Rule 10 Order"). The first successor trial judge "determined that he could not perform the thirteenth-juror review because the credibility of the original trial judge had been called into question by his misconduct outside the courtroom" and that "the original trial judge's misconduct constituted structural error" and granted the defendant's motion for new trial. *See id.* Upon review pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, our supreme court concluded that the first successor judge had erred by considering the trial judge's credibility as part of his thirteenth-juror review and by concluding that the trial judge's out-of-court conduct amounted to structural error requiring a new trial. *See id.* The high court vacated the order granting the defendant a new trial and remanded the case for the first successor judge "to determine expeditiously, under the standards articulated herein, whether he is able to fulfill his duty to perform thirteenth-juror review." *See id.*

---

[5]We note that the trial court imposed sentences and entered separate judgments of conviction for the merged offenses. We will address this error later in our opinion.

[6]Again, the trial court erroneously imposed sentences and entered separate judgments of conviction for the merged offenses but accurately indicated merger in each of the judgments.

-8-

Upon remand, the first successor trial judge again concluded that he was unable to perform the statutorily required review as thirteenth juror, and the State moved the first successor judge to recuse himself. The first successor judge denied the State's recusal motion, and this court granted the State's application for extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure. We concluded that the first successor judge erred by denying the State's recusal motion and ordered him recused from the case.

Our supreme court then appointed Judge Kurtz as the second successor trial judge. Judge Kurtz determined that he could perform thirteenth-juror review and then denied the defendant's motion for new trial. The defendant then filed a timely notice of appeal.

In this appeal, the defendant alleges that: the trial court erred by denying his motion to suppress evidence obtained during the searches of the Chipman Street residence; the trial court erred by denying his motion to suppress his statements to the police following his arrest; the trial court erred by denying his motion to suppress evidence obtained during searches of the defendant's person on January 19, 2007, and March 13, 2008; the trial court abused its discretion by admitting into evidence photographs taken of the victims after their deaths; the trial court erred by denying his motion to exclude testimony and evidence related to fingerprint examination; the trial court erred by denying his motion to exclude testimony and evidence related to the results of ballistics testing; the trial court erred by permitting courtroom spectators to wear and display buttons depicting the victims during the guilt phase of the trial; the State violated the defendant's constitutional rights by intercepting and examining privileged communications between the defendant and his attorneys; structural constitutional error occasioned by the out-of-court behavior of the trial judge entitles him to a new trial; the second successor trial judge erred by concluding that he could fulfill the statutory duty of thirteenth-juror review; the evidence was insufficient to support his convictions; the presentment was constitutionally insufficient; the presentment failed to adequately charge the defendant with liability for the offenses under a theory of criminal responsibility; the trial court erred by permitting jurors to submit questions for the witnesses; the trial court erred by permitting the jury to review the defendant's video-recorded pretrial statement to police in open court during its deliberations; the trial court erred by denying the defendant's motion to dismiss the presentment based upon the "unconstitutional composition of the jury venire"; the trial court erred by excluding evidence of the economic costs of the death penalty; the economic costs of the death penalty render it unconstitutional; the trial court erred by excluding those potential jurors who were not "death qualified"; imposition of the death penalty in this state violates various constitutional provisions; the State's Notice of Intent to Seek the Death Penalty was invalid because it was not returned by a grand jury; the sentence of death should be set aside based upon "gross racial disproportionality" in the imposition and execution of the death penalty; existing procedures for the imposition of the

death penalty fail to meet minimum constitutional standards as described by the Supreme Court; the imposition of the death penalty in this case violates the defendant's constitutional rights to substantive due process and equal protection under the law; the sentence of death was unconstitutional because the aggravating circumstances alleged by the State and found by the jury were not subjected to grand jury review; and the presentation of victim impact evidence during the penalty phase violated the defendant's right to due process and rendered the hearing fundamentally unfair. We consider each of the defendant's claims although not necessarily in the order presented.

## I. Structural Error

We consider first the defendant's claim of structural error based upon the out-of-court behavior of the trial judge because the judge's behavior, his subsequent plea of guilty to criminal charges and resulting resignation, and the media frenzy that those events created have loomed large over what was an already highly-publicized case. As indicated above, after the trial judge resigned from the bench following his plea of guilty to official misconduct, the defendant then sought a new trial based upon his claim that the trial judge's misconduct constituted structural error. Our supreme court concluded that the record did not support a conclusion that the trial judge's out-of-court misconduct had resulted in structural error requiring a new trial. *See Rule 10 Order*, slip op. at 3-4. In this appeal, the defendant revives his claim of structural error and argues that our supreme court erred by requiring a showing of prejudice under the circumstances of this case. The State asserts that the law-of-the-case doctrine prohibits this court from making a ruling on this issue.

Like our supreme court, we do not condone or excuse the trial judge's out-of-court malfeasance. That being said, our supreme court has held that "a trial judge's out-of-court misconduct, by itself" does not "constitute[] structural error unless there is proof that the misconduct affected the trial proceedings." *Rule 10 Order*, slip op. at 3 (citing *State v. Benson*, 973 S.W.2d 202, 206 (Tenn. 1998)). Our supreme court concluded that although the trial judge's out-of-court misconduct in this case was reprehensible, the record contained no proof that his misconduct "affected the integrity of the trials." *Rule 10 Order*, slip op. at 4. Two important principles of law prohibit us from revisiting that ruling.

First, the law-of-the-case doctrine prevents this court from considering the defendant's claim of structural error because that issue was already decided by our supreme court in a previous appeal in the same case. Our supreme court addressed the law-of-the-case doctrine in great detail in *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board*:

The phrase "law of the case" refers to a legal doctrine

-10-

which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was [an] issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). None of the delineated exceptions apply here. The defendant offered no new evidence following the remand by our supreme court, and there has been no change in the controlling law. Moreover, we cannot say that the ruling of our

supreme court was "clearly erroneous." In consequence, the law-of-the-case doctrine requires that we adhere to the ruling of our supreme court that the out-of-court misconduct of the trial judge did not constitute structural error in this case.

Second, even assuming for the sake of argument that we disagreed with the previous ruling of our supreme court, we lack the authority to overturn the ruling because the allocation of judicial power in this state forbids us from doing so. Our supreme court "is a direct creature of the [state] Constitution and constitutes the supreme judicial tribunal of the state and is a court of last resort." *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976). This court and "[a]ll other courts are constitutionally inferior tribunals subject to the actions of the Supreme Court." *Id.* The adjudications of the supreme court "are final and conclusive upon all questions determined by it, subject only to review, in appropriate cases by the Supreme Court of the United States." *Id.* (citing *Railroad v. Bryne*, 104 S.W. 460 (1907)).

Accordingly, because our supreme court has already ruled that the malefactions of the trial judge did not occasion structural error in this case, we cannot consider the issue in this appeal.

### II. Motion to Suppress Evidence Obtained During the January 9, 2007 Searches of the Chipman Street Residence

The defendant asserts that the trial court erred by denying his motion to suppress the evidence obtained during the searches of his Chipman Street residence on January 9, 2007, which evidence included the body of C.C. He claims, as he did in his pretrial motion, that the first search warrant executed at the Chipman Street residence on that day was invalid because the affidavit in support of the warrant did not bear the signature of the affiant. He also claims that because evidence discovered during the execution of the first warrant was included in the affidavit in support of the second warrant, the second warrant executed that day was also invalid. The State contends that the defendant lacks standing to challenge either warrant because he had abandoned the Chipman Street residence by the time the first warrant was executed, that the first warrant was valid despite the signature irregularity, that a previously-issued attachment for the defendant's arrest authorized entry into the Chipman Street residence independently from the challenged search warrants, that exigent circumstances justified the entry into the residence, and that admission of the challenged evidence at trial was authorized by both the inevitable discovery and independent source doctrines. As is discussed more fully below, it is our view that the inevitable discovery doctrine supported admission of the evidence obtained during the first search of the Chipman Street residence despite the invalidity of the first search warrant issued on January 9, 2007. We conclude that the second warrant was valid. Consequently, we affirm the trial court's denial of the defendant's motion to suppress.

*A. Facts*

The trial court held a hearing on the defendant's motion that spanned several days over the course of some months.

Investigator Todd Childress testified that on Sunday, January 7, 2007, he responded to a call that "[a] body had been located next to the railroad tracks behind 1701 Whittle Springs." The body was removed from the scene by the medical examiner's office, and Investigator Childress returned to the police station to examine missing person's reports. When he read the reports related to the disappearance of the victims in this case, he noticed immediately that the body matched the description of C.N. He recalled that because KPD Sergeant Tim Snoderly indicated that he knew C.N. personally, Sergeant Snoderly was asked to make the identification on the following morning. Investigator Childress explained that no attempt was made to identify the body that day because it was a Sunday.

Investigator Childress testified that C.C.'s family and friends located her 4Runner in the early morning hours of Monday January 8, 2007, at the intersection of Chipman and Glider Streets. He said that the vehicle was located approximately 400 yards from where C.N.'s body had been discovered. At some point early that Monday morning, Investigator Childress went off duty. Later that same morning, he returned to work and accompanied Sergeant Snoderly to the medical examiner's office to identify C.N.'s body. The two then went to inform C.N.'s parents of his death.

Investigator Childress testified that he then met with the "search and recovery team" and ordered the search and recovery officers to canvas the area where the 4Runner and C.N.'s body had been found looking for C.C. or "anything that doesn't belong there." Investigator Childress went off duty just after midnight on Tuesday, January 9, 2007. At approximately 3 a.m. on Tuesday, January 9, 2007, he received a telephone call from Mr. Crenshaw, who reported to him the discovery of the defendant's fingerprint on a bank envelope recovered from C.C.'s 4Runner. After the fingerprint was verified that morning, Investigator Childress "started pulling any type of report, pictures, criminal histories, anything . . . on Lemaricus Davidson." One of the items he discovered was an attachment issued for the defendant's failure to appear for a court date. Investigator Childress noted that the address listed on the defendant's driver's license, 2316 Chipman Street, was "150 yards from" the location where C.N.'s body was discovered and "less than a block and a half from where the car was located." After he had gathered all the information, he spoke with Investigator Steve Still to determine how they should proceed.

Investigator Childress said that a decision was made to apply for a warrant to search the Chipman Street residence because "if she [was] deceased, you know, we want[ed]

-13-

to try to do this right." He said that they hoped at that point to find C.C. alive. He recalled that an officer had driven by the Chipman Street residence and determined the house to be empty. Investigator Childress testified that he typed the affidavit in support of the warrant and the warrant itself and that it took him "probably a couple of hours, at least." He said that he did not notice any irregularities when he printed the documents, stating, "[W]e were just in a hurry to get it signed . . . so we could execute the search warrant." He took the warrant to the City-County Building where he met with an assistant district attorney, and they presented the warrant to Knox County General Sessions Court Judge Tony W. Stansberry. Investigator Childress said that Judge Stansberry "looked through it, you know." He said that Judge Stansberry placed him under oath and that he "swore to" the statements in the affidavit. He said that he then "signed it, handed it back to [Judge Stansberry], and he affixed his signature on it." The warrant indicates that it was issued at 12:53 p.m. on Tuesday, January 9, 2007.

After he obtained the search warrant, Investigator Childress met with officers in a parking lot near the Chipman Street residence. There he distributed a photograph of the defendant, and all the officers proceeded to the Chipman Street residence. Investigator Childress insisted that he intended to serve the attachment on the defendant as well as execute the search warrant, despite that he did not ask Judge Stansberry to issue an arrest warrant based upon the attachment and that he did not take the attachment with him to the residence.

Investigator Childress said that officers approached the residence and then knocked and announced their presence. He recalled that "the door was not latched, or it's partially ajar." Officers entered the residence at 1:39 p.m. and made a visual inspection of each room as they moved throughout the residence to secure the premises. At 1:42 p.m., Sergeant Keith Debow called out that he had discovered C.C.'s body in the kitchen of the residence inside a trash can.

At that point, Investigator Childress contacted the medical examiner's office, and representatives from that office arrived a short time later. Doctor Mileusnic-Polchan declared C.C. deceased and indicated that the body should be transported to the medical examiner's office inside the trash can. While preparations were being made for the transport of the body, officers did not conduct a "rigorous search" but continued to look around the residence. C.C.'s body was removed from the scene "a little after three." Officers then began their search in earnest, immediately discovering C.C.'s iPod "laying on top of a container."

Shortly thereafter, Investigator Childress received a telephone call from Assistant District Attorney General Kevin Allen, who told Investigator Childress that there

was a problem with the warrant and that they should stop searching and leave the residence. Investigator Childress said that he ordered the officers to stop searching, and they all left the residence. Some officers remained behind outside the Chipman Street residence while Investigator Childress went to meet with General Allen.

Investigator Childress explained that the signature line of the affidavit for the first search warrant had been "cut off" because he had "printed on 8 1/2 by 11 paper instead of legal paper." He said that he signed the warrant on the second page in the blank designated "for the officer to whom warrant is delivered." He said that he did not realize when he presented the affidavit to Judge Stansberry that the signature line had been cut off. He recalled that the first warrant to search the Chipman Street residence was the first search warrant application he had ever prepared. He noted that neither the assistant district attorney with whom he had met earlier nor Judge Stansberry had noticed the error either.

Investigator Childress said that he then prepared a second warrant with the assistance of General Allen. Investigator Childress recalled that at the behest of General Allen, he included information about the discovery of C.C.'s body in the application for the second warrant. The second warrant reflects that it was issued at 7:25 p.m. Returns were prepared for both warrants, left at the house, and filed. The body was listed on the first return.

KPD Sergeant Keith Debow testified that he and other members of the "S.W.A.T." team were asked to assist Investigator Childress in executing the search warrant at the Chipman Street residence. He described finding C.C.'s body shortly after entering the residence:

> I stepped into the kitchen with Lieutenant Fortner, is who was with me in there. When I entered into the kitchen, I saw in the far corner a large trash can that was oddly shaped. Looked like it was over-stuffed. I looked at Lieutenant Fortner and pointed at the trash can, and he immediately brought his weapon up to bear, and I stepped forward, brought my weapon to bear, flipped the trash can lid and saw the victim.

He said that he "thought that a suspect could possibly be hiding in the trash can," explaining that officers intended to detain "anyone inside the residence." Although he could not recall whether he had been provided with a physical description of the defendant, he said that such a description "would have been of little relevance, as we were going to stop anybody inside that house and detain them." He emphasized that he was not asked to "search for evidence" but to secure the residence so that other officers could "come in and search for the evidence."

-15-

Mr. Crenshaw testified that he was called to process C.C.'s 4Runner during the early morning hours of January 8, 2007. He photographed the vehicle, processed the exterior for fingerprints and then had the vehicle towed to the city's impound lot. He then proceeded to another crime scene. When he returned to work his regular 11 p.m. to 7 a.m. shift that evening, he went back to the 4Runner, having recalled seeing a bank envelope inside the car. He used ninhydrin to raise any fingerprints from the bank envelope and then ran the resulting prints through the statewide computer database. The program generated a list of possible matches, and Mr. Crenshaw made the definitive match. He "identified the fingerprint as being the right thumbprint of Lemaricus Davidson, a black male; date of birth, 6/13/81." Mr. Crensahw said that he made the initial identification at 2:42 a.m. on January 9, 2007, but that the identification "really wasn't official" until it could be verified by his co-worker, who was scheduled to arrive at work at 7:00 a.m. Nevertheless, Mr. Crenshaw sent an email noting the identification and telephoned Investigator Childress to tell him of the discovery.

Mr. Crenshaw said that he "cruised by" the Chipman Street residence, which was only two or three miles from the police station, at approximately 6:30 a.m. on January 9, 2007, hoping to hear "somebody . . . screaming or something like that and then I could get somebody over there to – to do something." He heard nothing but saw "a purplish-blue light inside the residence. . . . a TV possibly."

## B. Ruling of the Trial Court

The trial court concluded that the defendant had standing to challenge the search warrant based upon his property and privacy interests in the Chipman Street residence. The court observed that the record clearly established "that the affidavit was 'subscribed' to" and ruled "that the technical absence of the signature and signature line do not inva[l]idate the search warrant where the warrant is clear that the affidavit was sworn to before the approving judge." The court also ruled that the officers possessed the authority to enter the Chipman Street residence to arrest the defendant "on the attachment" that had been issued following the defendant's failure to appear on a misdemeanor citation. The court concluded that exigent circumstances also justified the entry into the Chipman Street residence because C.C. "was reasonably considered to be in danger of harm until found." Finally, the court determined that evidence seized from the Chipman Street residence on January 9, 2007, would not be admissible at trial under the inevitable discovery doctrine because information obtained during the first search was used to procure the second warrant.[7]

_____

[7]The trial court's ruling in this regard appeared to be conflating the separate but related doctrines of independent source and inevitable discovery. *See Murray v. United States*, 487 U.S. 533, 539 (1988) ("The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the

(continued...)

*C. Application of Law*

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).

*1. Standing*

As a threshold matter, the State claims that the defendant lacks standing to challenge the search of the Chipman Street residence because he had abandoned the residence by the time the search took place. The State argues that the defendant's act of fleeing the residence deprived him of any reasonable expectation of privacy in the residence.

The constitutional protections against unreasonable search and seizure "'are personal in nature, and they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.'" *State v. Cothran*, 115 S.W.3d 513, 520 (Tenn. Crim. App. 2003) (quoting *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001)). "One who challenges the reasonableness of a search or seizure has the initial burden of establishing a legitimate expectation of privacy in the place where property is searched." *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991) (citing *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982)); *see Katz v. United States*, 389 U.S. 347, 357 (1967); *see also State v. Prier*, 725 S.W.2d 667, 671 (Tenn. 1987) (stating that our state constitution affords no greater protection than the federal constitution and adopting the *Katz* standard). Thus, we must determine "(1) whether the

---

[7](...continued)
independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.").

individual had an actual, subjective expectation of privacy and [if so] (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Ross*, 49 S.W.3d at 839). The second part of this inquiry focuses on "whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances." *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 357).

Because the Fourth Amendment protects people and privacy rather than places and property, a property interest does not determine standing to challenge a search and does not control the right of officials to search and seize. *See Oliver v. United States*, 466 U.S. 170, 183 (1984); *Katz*, 389 U.S. at 351, 353. As the Supreme Court has recognized, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz*, 389 U.S. at 351. Importantly, a "person can lose his reasonable expectation of privacy in his real property if he abandons it. Thus, a person can, as he can with any other property, sufficiently manifest an intent to abandon his house." *United States v. Harrison*, 689 F.3d 301, 307 (3d Cir. 2012). "Abandonment for purposes of the Fourth Amendment differs from abandonment in property law; here the analysis examines the individual's reasonable expectation of privacy, not his property interest in the item." *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004) (citing *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)). Consequently, "abandonment," as understood in the constitutional context of unreasonable searches and seizures, "is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search." *United States v. Veatch*, 674 F.2d 1217, 1220-21 (9th Cir.1981).

Our supreme court has noted that a reviewing court should consider whether the individual has an ownership interest in the place searched, whether he has a possessory interest in the place searched, whether he has the right to exclude others from the place, and whether he undertook normal precautions to maintain the privacy of the place searched to determine whether an individual had a legitimate expectation of privacy in the place searched. *See Oody*, 23 S.W.2d at 560.

Here, the evidence established that the defendant and his girlfriend, Daphne Sutton, signed an agreement to lease the Chipman Street residence from November 1, 2006, to October 31, 2007. Ms. Sutton left the residence with her children before the offenses and moved in with a friend. The couple did not pay the rent on time in either December or January, but no effort had been made to evict them from the premises. Officers discovered

property that belonged to the defendant inside the residence during the search. Ms. Sutton affirmed that she met the defendant at the Chipman Street residence on the evening of January 7, 2007. The defendant then telephoned Ms. Sutton in either the late evening hours of January 7 or early morning hours of January 8 and asked if he could stay with her, claiming that Mr. Cobbins had locked him out of the residence. The defendant stayed with Ms. Sutton until January 9, 2007, when news of the victims' deaths broke. Ms. Sutton then asked the defendant to leave and drove him to a location on Western Avenue. The defendant stated that he left the Chipman Street residence before the victims were murdered by Mr. Cobbins, Mr. Thomas, and Ms. Coleman, but he did not indicate that he had no intent to return the residence.

Under the facts presented, we cannot conclude that the defendant had abandoned the Chipman Street residence. Based on the proof presented, the defendant was a leaseholder of the Chipman Street residence, and he kept his personal property there. Although he was not present inside the residence at the time of the search, he had been away from the residence for less than 48 hours when the search warrant was executed. His property was still located in the residence at the time of the search. Importantly, nothing in the record evinces the defendant's intent to abandon the residence at the time the first warrant was executed. These factors support the conclusion that the defendant maintained a reasonable expectation of privacy in the Chipman Street residence at the time of the search and thus had standing to challenge the search warrants in this case.

### 2. Validity of the Search Warrants

As an initial matter, we note that there is no question that both the first and second warrants issued on January 9, 2007, were issued on probable cause, provided by an affiant who had been sworn, by a neutral and detached magistrate. At bottom, the warrants in this case raise no issue of constitutional dimensions, and the sole challenge is that the warrants failed to comply with our statutory requirements for the issuance of search warrants.

### a. First Warrant

The defendant claims that the first search warrant executed at the Chipman Street residence was invalid because the affidavit in support of the warrant was unsigned.

"A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103; *see State v. Keith*, 978 S.W.2d 861, 869 (Tenn. 1998) ("The law in this State is clear that a written and sworn affidavit is an essential prerequisite to the issuance of a valid search warrant."). Additionally, before issuing a search warrant,

the magistrate "shall examine on oath the complainant and any witness the complainant may produce, and take their affidavits in writing, and cause them to be subscribed by the persons making the affidavits." T.C.A. § 40-6-104. Similarly, Tennessee Rule of Criminal Procedure 41 provides that "[a] warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for issuing the warrant." Tenn. R. Crim. P. 41(c)(1). "Stated simply, 'an affidavit is an indispensable prerequisite to the issuance of a search warrant.'" *State v. Lowe*, 949 S.W.2d 300, 303 (Tenn. Crim. App. 1996) (quoting *State v. Johnson*, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993)). Our supreme court has concluded that the statutory provisions relative to the issuance of search warrants and the requirements of Rule 41 are mandatory and that any evidence seized pursuant to a warrant that does not comply with these provisions cannot be admitted into evidence at trial. *See State v. Bobadilla*, 181 S.W.3d 641, 645 (Tenn. 2005) ("We have interpreted these rules strictly; the language is plain and the requirements are mandatory."); *Talley v. State*, 345 S.W.2d 867, 869 (Tenn. 1961).

"An affidavit generally has been defined in case law as 'a statement in writing, signed, and made upon oath before an authorized magistrate.'" *Keith*, 978 S.W.2d at 869 (quoting *Watt v. Carnes*, 51 Tenn. 532, 534 (1871)); *see Harvey v. State*, 60 S.W.2d 420, 421(Tenn. 1933). A "document, without a signature or oath, does not commit its purported author to any of the substantive statements it contains and, thus, has no evidentiary value." *Kenyon v. Handal*, 122 S.W.3d 743, 752 (Tenn. Ct. App. 2003). "An unsigned document cannot qualify as an affidavit." *Id.* n.6 (citing *Crocker v. Larson*, No. 01A01-9002-CV-00083 (Tenn. Ct. App., Nashville, Sept. 11, 1990) ("An unsigned 'affidavit' is not evidence and cannot be considered."))).

In this case, the evidence established that Investigator Childress' inadvertent printing of the affidavit on other than legal-sized paper resulted in the signature line for the affidavit being "cut off." As a result, no line was provided on which Investigator Childress could "subscribe" the affidavit. Instead, he placed his signature in the line indicating that the warrant had been issued to him for execution. In our view, his signature in that blank does not express itself as a subscription of the affiant and, hence, does not qualify as a subscription. This is particularly true given that Rule 41 also requires that the warrant contain the "name of the officer to whom the warrant was delivered for execution." Tenn. R. Crim. P. 41(c)(2)(D); *see also State v. Stepherson*, 15 S.W.3d 898, 902 (Tenn. Crim. App. 1999) (holding that although the result seemed "harsh" the "express language of the rule provides that the 'failure to endorse thereon . . . the name of the officer to whom issued' renders the search and seizure 'illegal'"). Nothing would suggest that Investigator Childress' signature may be construed to fulfill both of these compulsory provisions. Because the affidavit in support of the first search warrant was unsigned, it does not qualify as an affidavit as that term has been defined by our case law. In consequence, the warrant does not

comply with the mandatory requirements of the Code or Rule 41. As a result, the evidence seized pursuant to that warrant, C.C.'s body and the objects used to conceal her body, is subject to the exclusionary rule unless an exception justifies admission of the evidence at trial.[8]

### b. Second Warrant

The defendant claims that the second warrant executed at the Chipman Street residence was invalid because, for probable cause, it relied on information discovered during the execution of the first, invalid warrant. The trial court ruled that the second warrant executed on January 9, 2007, was invalid because the affidavit in support of the warrant included references to the evidence discovered pursuant to the first, invalid warrant. The State concedes that information obtained during the first search should not have been included in the affidavit for the second warrant but urges this court to redact the offending information from the second affidavit and conclude that, even without the offending information, the affidavit contained sufficient information to establish probable cause for the second search warrant.

"Pursuant to the independent source doctrine, an unlawful entry does not mandate the suppression of evidence located inside a residence if the evidence is subsequently discovered following the execution of a valid warrant based upon facts independent and separate from information discovered as a result of the unlawful entry." *State v. Carter*, 160 S.W.3d 526, 532 (Tenn. 2005), *abrogated on other grounds by Kentucky v. King*, 131 S. Ct. 1849, 1863 (2011). "The underlying policy of the independent source doctrine is that 'while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied.'" *Carter*, 160 S.W.3d at 532 (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). "In order for the subsequent warrant and search to be found genuinely independent of the prior unconstitutional entry, . . . information obtained during the illegal entry may not have been presented to the issuing Magistrate." *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992)

---

[8]In 2011, the legislature passed the Exclusionary Rule Reform Act, which provides a statutory good faith exception for the failure to comply with technical statutory and procedural rules regarding the issuance of warrants. *See* T.C.A. § 40-6-108 ("Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to this part or pursuant to Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of this part or any violation of Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c)."). Because the search in this case occurred in 2007, that provision is inapplicable.

(citing *Murray*, 487 U.S. at 542).

The proof established that the decision to obtain the second warrant was not "prompted by what they had seen during the initial entry," *see Murray*, 487 U.S. at 542, but the officers did present information obtained during the execution of the first, invalid warrant to the magistrate who issued the second warrant. Both before and after the ruling in *Murray*, however, the Sixth Circuit Court of Appeals routinely excised tainted information from warrants that contained information that was procured during an illegal search or seizure. *See United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) ("In sum, authority from this and other circuits, as well as the principles underlying the *Murray* rule, support an interpretation of the independent source rule that incorporates consideration of the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information."); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 552 (6th Cir. 2003) ("[W]e exclude from the affidavit only evidence gathered from the main floor of the house in violation of Shamaeizadeh's constitutional rights."); *United States v. Smith*, 730 F.2d 1052, 1056 (6th Cir. 1984) ("[W]hen a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, 'if the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted.'" quoting *United States v. Williams*, 633 F.2d 742, 745 (8th Cir. 1980)). Similarly, following our supreme court's ruling in *Clark*, this court continued to allow redaction of "any and all references to" information obtained during an illegal search followed by an evaluation of the "redacted affidavit in order to determine whether or not probable cause remains nonetheless." *State v. Randall Keith Smith and Nicholas Ryan Flood*, No. W2009-02678-CCA-R3-CD, slip op. at 11 (citing *State v. Vanderford*, 980 S.W.2d 390, 399-400 (Tenn. Crim. App. 1997)); *see also State v. Bowling*, 867 S.W.2d 338, 342-43 (Tenn. Crim. App. 1993).

Utilizing this well-established practice, we conclude that if all references to information gained during the first entry into the Chipman Street residence are removed, the remaining facts contained in Investigator Childress' affidavit in support of the second search warrant established probable cause to search the residence. To hold otherwise would, in our view, "violate the core rationale underpinning the independent source doctrine – that the police not be placed in a worse position than they would have been in if no misconduct had occurred." *Randall Keith Smith and Nicholas Ryan Flood*, slip op. at 11; *see also Jenkins*, 396 F.3d at 758-59 ("Invalidating a search warrant because the magistrate was affected in some minor way by tainted information, when the warrant would have been granted even without the tainted information, would put the police in a worse position than they would have been in had they not presented the tainted information to the magistrate."). This is particularly true where, as here, the violation that led to the invalidation of the first warrant was technical in nature and did not touch upon the defendant's constitutional rights. Thus,

the second warrant was valid.

Because the second search warrant was valid, suppression of the evidence discovered *during the second January 9, 2007 search* was not required. We discuss more fully in our analysis of the inevitable discovery doctrine the implications of the validly issued second warrant *on the discovery of C.C.'s body and other evidence during the first January 9, 2007 search*.

### 3. *Service of the Attachment*

The State asserts that an attachment issued by the Knox County General Sessions Court following the defendant's failure to appear on a misdemeanor citation justified the initial January 9, 2007 entry into the Chipman Street residence. The defendant contends that the attachment does not qualify as an arrest warrant. Additionally, he argues that even if the attachment qualified as an arrest warrant, it would not have justified the entry into the Chipman Street residence under the circumstances of this case.

After he identified the defendant's fingerprint on the bank envelope recovered from C.C.'s 4Runner, Mr. Crenshaw conducted a records check that showed that an attachment had been issued by the Knox County General Sessions Court for the defendant's failure to appear on a misdemeanor citation. Investigator Childress later confirmed that members of the Knox County Sheriff's Office had the attachment "in hand." Investigator Childress testified that his two-fold purpose in entering the Chipman Street residence on January 9, 2007, was to execute the search warrant and arrest the defendant pursuant to the attachment. He conceded, however, that he did not obtain a copy of the attachment before going to the residence.

Tennessee Code Annotated section 40-7-118 provides that if a person to whom a citation in lieu of an arrest has been issued "fails to appear in court on the date and time specified or fails to appear for booking and processing prior to the person's court date, the court shall issue a bench warrant for the person's arrest." T.C.A. § 40-7-118(f). The attachment, which was exhibited to the hearing, indicates that the "reason" for its issuance was the defendant's failure to appear for booking. In our view, the attachment at issue was the functional equivalent of an arrest warrant, given that it "commanded in the name of the State" the "arrest" of the defendant. That being said, service of the attachment in this case did not justify the entry into the residence because the State failed to establish that the police had "reason to believe" that the defendant was inside the residence when they knocked on the door. *See Payton v. New York*, 445 U.S. 573, 603 (1980) ("For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the

-23-

suspect is within."). To the contrary, the evidence established that Officer Charles Lee drove by the residence and indicated that there appeared to be no activity inside the house. Neither Investigator Childress nor Officer Debow, both of whom were present when the search warrant was executed, testified that the residence bore any indicia of activity. When officers knocked on the door and announced their presence, they heard neither a reply nor any sounds indicating activity within. Because the officers lacked reason to believe that the defendant was inside the Chipman Street residence at the time the first warrant was executed on January 9, 2007, service of the attachment did not justify the entry into the residence.

*4. Exigent Circumstances Exception to the Warrant Requirement*

Because we have determined that the first search warrant executed at the Chipman Street residence on January 9, 2007, was invalid, we must now determine whether an exception to the warrant requirement justified the warrantless entry into the residence that resulted in the discovery of C.C.'s body.

The State contends that exigent circumstances justified the entry into the Chipman Street residence, and the defendant asserts that the delay between the discovery of the defendant's fingerprint on the bank envelope found in C.C.'s 4Runner and the entry into the residence militates against a finding of exigency.

The "most basic constitutional rule" with regard to search and seizure "is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (quoting *Katz v. United States*, 389 U.S. at 357); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, we necessarily indulge the presumption that the search or seizure in this case was unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g.*, *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception.").

The generally recognized exceptions to the Fourth Amendment warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search

-24-

under exigent circumstances, and . . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted). The State claims that the first entry into the Chipman Street residence was impelled by exigent circumstances.

"Given the importance of the warrant requirement in safeguarding against unreasonable searches and seizures, a circumstance will be sufficiently exigent only where the State has shown that the search is imperative." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008) (citing *Coolidge*, 403 U.S. at 454-55; *State v. Hayes*, 188 S.W.3d 505, 514 (Tenn. 2006); *State v. Yeargan*, 958 S.W.2d 626, 641 (Tenn. 1997) (Reid, J., concurring)). Our supreme court has provided the following non-exclusive list of "frequently-arising situations that have been found to be sufficiently exigent" to justify the warrantless search of a residence: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." *Meeks*, 262 S.W.3d at 723 (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990); *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005)). Said differently, "[e]xigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." *Meeks*, 262 S.W.3d at 723.

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." *McNeely*, 133 S. Ct. at 1559 (citing *Brigham City, Utah*, 547 U.S. at 406; *Illinois v. McArthur*, 531 U.S. 326, 331 (2001); *Richards v. Wisconsin*, 520 U.S. 385, 391-96 (1997); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973)). The Supreme Court explained:

> We apply this "finely tuned approach" to Fourth Amendment reasonableness in this context because the police action at issue lacks "the traditional justification that . . . a warrant . . . provides." *Atwater v. Lago Vista*, 532 U.S. 318, 347 n.16 (2001). Absent that established justification, "the fact-specific nature of the reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), demands that we evaluate each case of alleged exigency based "on its own facts and circumstances." *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

*McNeely*, 133 S. Ct. at 1559. This analysis focuses on the information known to the officer at the time of the search and any reasonable inferences that may be drawn therefrom. *Meeks*,

-25-

262 S.W.3d at 723-24.

The evidence in this case established that after C.N.'s body was discovered on January 7, 2007, the police waited until the following day to send someone to identify the body at the medical examiner's office. When C.C.'s 4Runner was discovered at approximately 1:30 a.m. on Monday, January 8, 2007, by her friends and family rather than the police, only 400 yards away from the location of C.N.'s body, the police towed the vehicle to the impound lot and waited more than 18 hours to conduct a thorough search of the vehicle. By 2:52 a.m. on January 9, 2007, however, the police possessed information that indicated that the defendant had been inside C.C.'s 4Runner and that the defendant lived at 2316 Chipman Street, which was only "150 yards from" the location where C.N.'s body was discovered and "less than a block and a half from" the location where C.C.'s 4Runner was found abandoned. Witness testimony established that the officers waited to obtain verification of the fingerprint identification from another KPD employee until the following morning rather than seeking an immediate verification. Even after they obtained that verification, however, the police spent several hours preparing a search warrant and did not execute the warrant until nearly 45 minutes after it was issued. Although we have stated "that 'delay alone . . . does not bar reliance on the emergency aid exception,'" *State v. William T. Davis*, No. M2004-03060-CCA-R3-CD, slip op. at 9 (Tenn. Crim. App., Nashville, Sept. 15, 2005) (quoting *State v. Sharp*, 973 P.2d 1171, 1176 (Ariz. 1999); *Foutz v. City of West Valley City*, 345 F. Supp. 2d 1272, 1277 (D. Utah 2004)), the delay in this case was a matter of hours rather than a matter of minutes. Indeed, the investigative pace in this case can fairly be described as glacial under the circumstances. In our view, these circumstances simply do not indicate that any sort of exigency permeated the police investigation.

### 5. Inevitable Discovery Exception to the Exclusionary Rule

Finally, the State avers that the doctrine of inevitable discovery justifies admission of the evidence collected pursuant to the first, invalid search warrant. On this point, we agree with the State.

"Generally, evidence obtained as a direct or indirect result of unconstitutional police conduct will be excluded as the 'fruit' of the primary constitutional breach." *State v. Hill*, 333 S.W.3d 106, 122-23 (Tenn. Crim. App. 2010) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). "Under the doctrine of 'inevitable discovery,' however, illegally obtained evidence will be deemed admissible at trial if the State can establish that the evidence would have inevitably been discovered by lawful means." *Hill*, 333 S.W.3d at 123 (citing *State v. Patton*, 898 S.W.2d 732, 735 (Tenn. Crim. App. 1994)).

> Before the inevitable discovery doctrine will permit the
> admission of illegally obtained evidence, the State must
> demonstrate "first, that certain proper and predictable
> investigatory procedures would have been utilized in the case at
> bar, and second, that those procedures would have inevitably
> resulted in the discovery of the evidence in question."

*Hill*, 333 S.W.3d at 123 (quoting *State v. Coury*, 657 S.W.2d 777, 780 (Tenn. Crim. App. 1983)). "Proof of inevitable discovery may involve 'no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment.'" *Hill*, 333 S.W.3d at 123 (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984), and citing *State v. Cothran*, 115 S.W.3d 513, 525 (Tenn. Crim. App. 2003)).

The Supreme Court adopted and applied the inevitable discovery doctrine in *Nix*. In that case, Nix abducted 10-year-old Pamela Powers from a Des Moines, Iowa YMCA on Christmas Eve in 1968 and later turned himself in to authorities in Davenport, Iowa. *Nix*, 467 U.S. at 434-35. While transporting Nix via car from Davenport to Des Moines, officers initiated a conversation with Nix that elicited from him incriminating statements and ended with his guiding the police to the victim's body. *Id.* at 435-36. The trial court deemed Nix's statements inadmissible but allowed the prosecution to offer evidence concerning the location and condition of the body under the theory that had the search for the victim continued, the body would have been discovered within a short time and in the same condition as actually found. *Id.* at 437-40.

In support of the application of the inevitable discovery doctrine, the *Nix* prosecution offered specific evidence that the volunteer search team assembled to search for the victim had ended its search only two and one-half miles from the location of the body after the defendant identified the location and that, based on the earlier progress of the search, the victim's body would have been discovered in an additional three to five hours of continued searching. *Id.* at 449.

> "On this record," the Supreme Court concluded, "it is clear that
> the search parties were approaching the actual location of the
> body, and we are satisfied, along with three courts earlier, that
> the volunteer search teams would have resumed the search had
> Williams not earlier led the police to the body and the body
> inevitably would have been found."

*Hill*, 333 S.W.3d at 123-24 (quoting *Nix*, 467 U.S. at 449-50). To warrant application of the inevitable discovery doctrine, the State must demonstrate by a preponderance of the evidence

that "the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444. The Sixth Circuit Court of Appeals has noted that "[t]he inevitable discovery doctrine is conceptually more problematic than the independent source doctrine because it involves a degree of deducing what would have happened rather than simply evaluating what actually happened." *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996).

The evidence presented at the hearing on the motion to suppress and at trial established that the police had focused upon not only on the defendant but also the Chipman Street residence at the time of the search. C.N.'s body had been discovered only "150 yards from" the Chipman Street residence, and C.C.'s 4Runner had been discovered "less than a block and a half from" the residence. After C.N.'s body was identified, members of the "search and recovery team" were sent into the area around the Chipman Street residence, which was located a short distance from the police station, to search for C.C. Additionally, her friends and family, who had already discovered the 4Runner, were actively searching the area around the Chipman Street residence. The officers had legal possession of the 4Runner and legally obtained the defendant's fingerprint from a bank envelope found in the 4Runner. A legally-conducted records check showed that the defendant listed the Chipman Street residence as his residence on his driver's license and other legal documents. Mr. Crenshaw and KPD Officer Charles Lee had driven by the Chipman Street residence at separate times on January 9, 2007, lessening the chance that the evidence might be removed from the residence before police officers could gain legal entry. The defendant had absented himself from the residence. As a practical matter, from the point that officers linked the defendant to the 4Runner and linked the Chipman Street residence to the defendant, the residence was under the effective control of and surveillance by the KPD. To be sure, from the time the officers first entered the Chipman Street residence to execute the first search warrant until the time they entered the residence to execute the second search warrant and at all times thereafter, the residence was under the actual and exclusive control of the KPD. As such, there was no chance that C.C.'s body would have been moved before the officers had an opportunity to legally discover and seize it.

Aside from the ongoing police investigation, we note that James Mitchell, the self-described handyman and rent collector for the defendant's landlord, Sammie Peroulas, testified that, as of January 9, 2007, he had already gone to the Chipman Street residence twice to collect January's rent. Each time, the defendant had told Mr. Mitchell that he did not have the money to pay the rent and had asked Mr. Mitchell to come back at a later date. When he returned a third time, Mr. Mitchell saw police tape around the residence and learned of the crimes. Moreover, the defendant's lease agreement contained a provision permitting the landlord or the landlord's agents "the right at all reasonable times during the term of [the lease] . . . to enter the House for the purpose of inspecting the premises." That provision

would have provided another avenue of entry into the house that could have been exploited by the police. Additionally, Ms. Sutton, who was also listed as a lessee, later cooperated extensively with the police and could have granted consent to search the Chipman Street residence because she was a party to the lease agreement.

This evidence demonstrates that the police investigation, had it continued in the absence of the illegality, would have resulted in the officers lawfully entering the Chipman Street residence and discovering C.C.'s body. They had ample probable cause to support the issuance of a warrant to search the Chipman Street residence, and they did obtain a warrant that was issued on probable cause and that complied with constitutional requirements. The illegality here is based entirely on a state law violation that did nothing to dissipate the probable cause that existed before the police entered the Chipman Street residence. The police then obtained a second warrant that we have deemed independent from the state law violation that renders the first search warrant invalid. They executed that search warrant at the residence on the same day as the initial, illegal entry. Additionally, officers of the federal government and the TBI executed a validly executed search warrant on January 15, 2007. Had they not already seized her body, the police most certainly would have done so upon executing either the second search warrant or the federal search warrant. *See Murray*, 487 U.S. at 542 ("It seems to us, however, that reseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered."). Clearly, the preponderance of the evidence established that lawful means of investigation were being pursued before the first, illegal entry that would have led to the discovery of C.C.'s body. *See Nix*, 467 U.S. at 444 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received."); *see also id.* n.5 ("We are unwilling to impose added burdens on the already difficult task of proving guilt in criminal cases by enlarging the barrier to placing evidence of unquestioned truth before juries."). For this court to conclude otherwise would require us to "reject logic, experience, and common sense," *id.* at 444, and "would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice," *id.* at 447.

The Supreme Court has repeatedly cautioned against "'[i]ndiscriminate application'" of the exclusionary rule and has applied the rule only "'where its deterrence benefits outweigh its substantial social costs.'" *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (citations omitted); *see also Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998) ("Because the exclusionary rule precludes consideration of reliable, probative evidence, it imposes significant costs: it undeniably detracts from the truthfinding process and allows many who would otherwise be incarcerated to escape the consequences of their actions. Although we have held these costs to be worth bearing in certain circumstances, our

cases have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." (citations omitted)). Here, where the record amply demonstrates that C.C.'s body would inevitably have been discovered by lawful means, we can see no reason to exclude this "reliable, probative evidence." *See Scott*, 524 U.S. at 364. In consequence, the trial court did not err by denying the defendant's motion to suppress the evidence obtained during the first January 9, 2007 search of the Chipman Street residence.

### *III. Motion to Suppress Pretrial Statements*

The defendant asserts that the trial court erred by denying his motion to suppress the recorded statement he made to the police following his January 11, 2007 arrest. In the motion, the defendant claimed that the statements were the product of an unconstitutional custodial interrogation and that the statements were involuntarily given. Specifically, the defendant contends that the overwhelming police presence during his arrest and the harsh manner in which he was treated following his arrest rendered his statement involuntary. He claims that his arrest was illegal because it was predicated on the initial illegal entry into the Chipman Street residence and by the faulty attachment. The State contends that the trial court properly denied the motion.

### *A. Facts*

The defendant was arrested at an abandoned house on Reynolds Street in Knoxville on January 11, 2007. Sergeant Debow, who participated in the arrest, testified at the suppression hearing that he and other members of the "S.W.A.T." team were asked to participate in the arrest along with other KPD officers, members of the Knox County Sheriff's Office, agents of the Bureau of Alcohol Tobacco and Firearms, and representatives of the United States Marshal Service. The officers "surrounded the house" and made their presence known. At that point, the defendant stepped to the window, "somewhat complying" with the officers' directive to show himself, and a decision was made "to have him come out of the house." When the defendant indicated that he could not open the window, Sergeant Debow "broke the window with the barrel of [his] weapon" and cleared the broken glass from the window. When Sergeant Debow asked the defendant where the defendant's gun was, the defendant "pointed down either towards his waistline or on the floor." Sergeant Debow then ordered the defendant to remain still, and two other officers pulled the defendant out of the house through the window. The defendant was placed on the ground, and another officer performed "a cursory pat down checking him for weapons." He recalled that approximately 30 officers from the various agencies were present during the arrest.

KPD Investigator Greg McKnight testified that when he arrived at the

Reynolds Street location, the defendant was seated in a patrol car. Investigator McKnight did not observe any injuries to the defendant. He provided the defendant with *Miranda* warnings "off the top of [his] head" and then engaged in "general conversation" with the defendant. He maintained that he did not ask the defendant any questions about the crimes. The defendant, who appeared to be "kind of relaxed, not for sure what was going on," asked whether the police had located Mr. Cobbins and how they had managed to locate the defendant. No one ever hit, yelled at, abused, or was otherwise "mean to" the defendant from the time of his arrest until he was deposited into an interview room at the police station.

KPD Investigator Ryan Flores interviewed the defendant following the defendant's arrest because Investigator Childress had gone to Kentucky to arrest Mr. Cobbins, Ms. Coleman, and Mr. Thomas. Investigator Flores observed that the defendant's shirt was torn but did not notice any injuries to the defendant's person. He read the *Miranda* warnings to the defendant and provided the defendant with a written rights waiver, which the defendant signed. After executing the rights waiver, the defendant agreed to answer Investigator Flores' questions. Investigator Flores recalled that the defendant ate "some Zatarain rice in a bag and some Beef Jerky sticks" and drank "some water" that Investigator Flores provided him.

The trial court denied the defendant's motion, concluding that his arrest was legal, that the recitation of *Miranda* warnings was sufficient to convey the defendant's rights to remain silent and have a lawyer present during questioning, and that the defendant's statement was voluntarily given.

## B. Application of Law

As indicated, the trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *See, e.g.*, *Binette*, 33 S.W.3d at 217. We review the application of the law to the facts de novo with no presumption of correctness. *Keith*, 978 S.W.2d at 864.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during

custodial interrogations following appropriate provision of *Miranda*[9] warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and to those conducted before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. It has been said that "[t]he test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[10] Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544-45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced

---

[9]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[10]This test is exactly the same as that promulgated in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961), so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

-32-

and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545).

The defendant first asserts that his statement was involuntary because it was the product of his illegal arrest on an invalid attachment. As indicated above, the attachment that was exhibited to the hearing on the defendant's motion to suppress the evidence seized during the search of the Chipman Street residence was the functional equivalent of an arrest warrant in that it specifically authorized the arrest of the defendant. Additionally, the State exhibited to the hearing on the motion to suppress the statement a criminal complaint from the United States District Court for the Eastern District of Tennessee. Most importantly, however, the record clearly establishes that the police officers who effectuated the defendant's arrest had the probable cause to do so.

> Probable cause in the context of a warrantless arrest exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.

*State v. Lewis*, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000) (citation and internal quotation marks omitted). By the time of the defendant's arrest, C.N.'s body had been discovered, shot and badly burned, only yards from the defendant's residence, the police identified the defendant's fingerprint on a bank envelope found inside C.C.'s 4Runner, and C.C.'s body had been discovered stuffed inside a trash can inside the defendant's residence. Under these circumstances, the defendant's January 11, 2007 arrest was valid regardless of the validity of the attachment.

The defendant next contends that the trial court should have suppressed his statement because the *Miranda* warnings provided by Investigator Flores were incomplete. In *Miranda*, the United States Supreme Court ruled that unless an accused is advised of his constitutional rights to remain silent and to counsel before a custodial interrogation, any statement elicited during the interrogation is not admissible in trial. *Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("[T]he admissibility in evidence of any statement given during custodial interrogation of a suspect [depends] on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as '*Miranda* rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" (quoting *Miranda*, 384 U.S. at 479)). An accused may waive his rights so

long as he is adequately apprised of them and of the consequence of relinquishing his rights. *See, e.g.*, *Stephenson*, 878 S.W.2d at 544.

The rights waiver signed by the defendant and exhibited to the hearing informed the defendant that he had the "right to remain silent," that "anything you say can be used against you in court," that he had the "right to consult with a lawyer and to have a lawyer present with you while you are being questioned," that if he desired but could not afford a lawyer "a lawyer will be appointed to represent you free of any cost to you," that even if he decided "to answer questions now without a lawyer present, you will still have the right to stop answering at any time," and that he had the "right to stop answering questions at any time until you talk to a lawyer." In our view, the warnings as contained in the rights waiver and read to the defendant by Investigator Flores were sufficient to convey to the defendant the constitutional protections afforded him. *See Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by *Miranda*.'" (quoting *California v. Prysock*, 453 U.S. 355, 361 (1981) (alteration in *Duckworth*)). Moreover, the defendant indicated clearly his understanding of his constitutional rights, saying, "I know my rights you ain't gotta read me my rights[.] I know my rights." Noting his familiarity with the law, the defendant also said, "I've been in . . . prison for six years. The law book and all that s[***]. I done read all that s[***]." On this record, we conclude that the defendant knowingly and intelligently waived his constitutional rights and agreed to speak to Investigator Flores.

Finally, the defendant contends that his statement was not voluntarily given because his will was overborne by the show of force by the police during his arrest. At the time of his arrest, the defendant had armed himself and holed up in an abandoned house. He was wanted on federal firearms and carjacking offenses and was a suspect in the brutal slayings of C.N. and C.C. We cannot say that the manner of the defendant's arrest was not commensurate with the severity of the situation. Nor can we say that the record indicates that the defendant's will was in any way overborne by the police. He was not abused, injured, threatened, or plied with false promises.

Because the defendant provided a fully voluntary statement following his legal arrest and a valid waiver of his constitutional rights, the trial court did not err by denying the defendant's motion to suppress the statement he provided to the police following his arrest.

*IV.  Motion to Suppress Searches of the Defendant's Person on January 19, 2007, and March 13, 2008*

The defendant avers that the trial court erred by refusing to suppress the results of testing performed on hair and DNA samples obtained from his person pursuant to a federal warrant issued on January 19, 2007, and a state warrant issued on March 13, 2008.  He claims that the warrants were invalid because for probable cause they relied on information obtained during the allegedly illegal search of his residence.  The State argues that because the evidence seized during the January 9, 2007 searches was not subject to suppression, inclusion of that information in the affidavits in support of the search warrants issued on January 19, 2007, and March 13, 2008, did not invalidate the warrants.  In the alternative, the State argues that even if the challenged information is redacted from the affidavits, the affidavits still established probable cause for the issuance of the warrants.

Both of the warrants in question contain information that was discovered during the autopsy of C.C.'s body, which was discovered by officers during the execution of the first, invalid warrant to search the defendant's residence.  We have already concluded that evidence of the discovery of C.C.'s body was not subject to suppression because the inevitable discovery exception to the exclusionary rule applies.  Once the evidence was within the possession of the State, the State was free to examine or perform testing on the evidence.  In our view, information related to that examination and testing was so attenuated from the taint of the initial illegal entry of the Chipman Street residence that its inclusion in the warrants for the search of the defendant's person, particularly the warrant issued more than a year later, did not invalidate either warrant.  *See Murray*, 487 U.S. at 536-37 ("[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" (citation omitted)).

Moreover, we agree with the State that, even assuming that the warrants contained still-tainted information, redacting that information does not strip them of probable cause.  *See, e.g.*, *Jenkins*, 396 F.3d at 760.  Without the challenged information, the warrants were still predicated on probable cause to search the defendant's person to obtain forensic evidence related to the rape and murder of C.N.  Consequently, the trial court did not err by denying the defendant's motion to suppress the searches of his person on January 19, 2007, and March 13, 2008.

*V.  Admission of Photographs*

The defendant contends that the trial court erred by admitting photographs of

the victims' bodies taken before and during their respective autopsies, claiming that the photographs were unduly "graphic, shocking, horrifying, and inflammatory." The State contends that the trial court did not abuse its discretion by admitting the challenged photographs.

The defendant filed a pretrial motion to exclude photographs of the victims taken after their deaths, and the trial court held two hearings on the motion. The court considered hundreds of photographs offered by the State at the first hearing and excluded many as redundant or lacking probative value. At another hearing, Doctor Mileusnic-Polchan testified regarding the need for the photographs to help explain her testimony to the jury. She maintained that although she could describe the various injuries to the victims, it would be impossible for the jury to truly comprehend them without the aid of the photographs, characterizing her testimony alone as "not good enough." During this hearing, the trial court again excluded a number of photographs, concluding that they were either redundant or not a necessary complement to the medical examiner's testimony. Following the trial court's measured and thorough culling, only 22 of the challenged photographs remained — 12 of C.N. and 10 of C.C.

The photographs of C.N. depict the condition and position of his body when it was discovered, the ligatures on his hands and feet, the wrapping of his head, the extreme charring that resulted from the burning of the body, the three gunshot wounds that caused his death, and the trauma to his anus that established that C.N. had been sexually assaulted. The challenged photographs of C.C. show several different views of her body after it had been removed from the trash can and placed on the autopsy table but while she remained bound. Other photographs depict the evidence of asphyxiation and suffocation, which were listed as the causes of her death. Two photographs display C.C.'s perineal area and were used by the medical examiner to highlight the substantial blunt force trauma to this part of her body. Doctor Mileusnic-Polchan utilized each of the challenged photographs during her testimony.

"Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" *Carter*, 114 S.W.3d at 902 (quoting *Banks*, 564 S.W.2d at 950-51). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant photographs may be excluded, however, if their probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as

"[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *See Banks*, 564 S.W.2d at 951. "The admission of photographs lies within the sound discretion of the trial court and will not be overturned on appeal absent a showing that the trial court abused that discretion." *State v. Odom*, 336 S.W.3d 541, 565 (Tenn. 2011) (citing *Banks*, 564 S.W.2d at 949).

To be sure, the photographs depicting C.N. and C.C. after their deaths were disturbing, but we are mindful that the injuries inflicted upon the victims were also disturbing. We conclude that the photographs, though graphic, were not so shocking or gruesome that the probative value of the photographs was substantially outweighed by the danger of *unfair* prejudice. Instead, the photographs accurately illustrated for the jury the nature and circumstances of the crimes committed against C.N. and C.C. Prior to trial, the trial court carefully culled the numerous photographs offered by the State and, using a measured approach, admitted the challenged photographs only to depict specific injuries described by Doctor Mileusnic-Polchan. The defendant points to the fact that a member of the district attorney general's office fainted during the presentation of the photographs as evidence that they were unduly inflammatory; however, the effect of the photographs on an unnamed member of the district attorney general's staff is not relevant to our inquiry. The trial court did not abuse its discretion by admitting the challenged photographs.

In a related issue, the defendant contends that the trial court erred by refusing to grant his motion for a mistrial following the fainting incident. The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court, and this court will disturb the trial court's ruling in this regard only when there has been an abuse of the trial court's discretion. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *Id*.

The defendant has failed to establish that the trial court abused its discretion by refusing to grant a mistrial. The fact that a member of the district attorney general's staff fainted during the presentation of the photographs did not, in our view, "preclude[] an impartial verdict" in this case. Nothing suggests that the State could have predicted that the staff member would be overcome by the photographs or that the incident was orchestrated

by the State for the purpose of inflaming the jury. Moreover, the trial court issued a curative instruction, warning the jury that they should not allow the incident to impact their verdict. Under these circumstances, the trial court did not abuse its discretion by refusing to grant the defendant's motion for a mistrial. *See State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990) (holding that a mistrial was not required when the trial court issued a curative instruction following a witness's outburst); *see also generally State v. Myron Lorenzo Johnson*, No. M2008-02198-CCA-R3-CD (Tenn. Crim. App., Nashville, February 12, 2010) (holding that a mistrial was not required when the trial court issued a curative instruction after the victim's mother fainted during the testimony of the medical examiner); *State v. Terrence McCray*, No. W2005-00479-CCA-R3-CD (Tenn. Crim. App., Jackson, Sept. 5, 2006) (holding that a mistrial was not required when the trial court gave a curative instruction following an emotional display by the victim's aunt, who had fallen on the floor); *State v. James Cleveland Breer*, No. W2001-00390-CCA-R3-CD (Tenn. Crim. App., Jackson, Feb. 7, 2002) (holding that no mistrial was required when trial court issued a curative instruction following an emotional outburst by the victim's grandmother).

## VI. Fingerprint Identification

The defendant asserts that the trial court abused its discretion by denying his pretrial motion to exclude the testimony of Mr. Schade and Mr. Crenshaw concerning the process used to match the defendant's fingerprints on several items of evidence linking him to the offenses in this case. He claims that "the methodology known as ACE-V, utilized for the comparison and identification of fingerprints in this case[, is] inherently unreliable and lacking scientific validity."

At the pretrial hearing on the defendant's motion, Mr. Schade testified that he received a degree in criminal justice from San Diego State University, a degree in political science, and a master's degree in public administration. In addition, he had become a certified fingerprint examiner. Before obtaining his certification, he participated in 80 hours of training with the Federal Bureau of Investigation. To obtain his certification via the International Association for Identification, Mr. Schade sat for a six-hour, three-part examination to test his knowledge of "fingerprint pattern identification." He said that, "so far," no two people had been identified as having identical fingerprints.

He explained that the analysis portion of fingerprint identification required the examination of "three levels of detail." "Level one detail . . . is just going to be . . . the flow of the ridges as they go through your fingers, palms, whatever it is." Level two detail is "the bifurcations and closures, dots, islands, just things like that." Level three detail is "ridgeology and poroscopy which is just going to be the width of the ridges, the flow of the ridges, how they go around the other ridges, and then the pores." The next step of

identification is the "comparison stage . . . where you're trying to get a determination of whether the prints could be matched up or not, which brings you to the evaluation." The last stage is verification, which requires that a second person verify the identification. At the time of the offenses in this case, the KPD employed two certified fingerprint examiners, Mr. Schade and Mr. Crenshaw, who made and verified all fingerprint identifications.

Mr. Schade said that the KPD had utilized this method of fingerprint examination for at least 10 years prior to the hearing. He said that he would lose his certification if he misidentified a fingerprint, adding, "[T]hen you're going to have to probably look for another job or find something else that you're going to be able to do, because you're not going to be able to look at fingerprints anymore." He said that he and Mr. Crenshaw made an average of 300 fingerprint identifications each year and that a single misidentification would compromise all the other identifications.

Mr. Schade said that fingerprints were utilized in fields other than criminal justice. Referring to the National Academy of Sciences report offered by the defendant as evidence of the flawed science of fingerprints, Mr. Schade said that it was his understanding that the purpose of the report was to receive funding for the improvement of the forensic sciences. Mr. Schade emphasized that "the last thing" he wanted to do when making a fingerprint identification was "put the wrong person in jail" and "make the wrong ID and lose [his] job."

During cross-examination, Mr. Schade testified that he had received all of his training in fingerprint identification from law enforcement sources "because typically the people that are doing fingerprint comparisons are going to be people in law enforcement." He said that, in order to maintain his certification, he had to pass a re-certification test every five years. He acknowledged that the KPD did not require that he or Mr. Crenshaw undergo proficiency testing. He said that although he had not published any articles on fingerprint identification, he regularly taught a course on fingerprint identification at the National Forensic Academy. Mr. Schade could not identify any specific scientific study that arrived at the conclusion that all fingerprints are unique, but he said "that through 150 years of fingerprint comparisons nobody's ever found somebody to have the exact same fingerprints." He added, "[J]ust to give you an idea about fingerprints, just points wise, there's about 75 to 115 just points, not counting the pores or not counting the ridge flow pattern on a finger. So for all of those points to line up in the same spot would be just incredible." He said that he did not know the error rate for fingerprint identification.

He said that the KPD did not require documentation of the analysis phase of identification in every case, and he added that requiring such documentation would be overwhelming given the number of fingerprints that are subjected to this initial step. Mr.

Schade said that the department did not require that he examine prints at a certain level of detail before making an identification. He said that he and Mr. Crenshaw did not typically confer before making an identification because they worked alternate shifts.

The defendant exhibited to the hearing a partial copy of a 2009 report by the National Research Counsel that identified weaknesses in the ACE-V method of fingerprint identification, describing the method as "too broad to ensure repeatability and transparency." The publication also noted that "ACE-V does not guard against bias" and that it "does not guarantee that two analysts following it will obtain the same results." The publication recommended further research into the ACE-V method and fingerprint identification in general.

The trial court, via a written order, deemed the evidence admissible. The court found both Mr. Schade and Mr. Crenshaw qualified to offer expert testimony on fingerprint analysis. The court also concluded that the ACE-V method was "sufficiently reliable," specifically finding that the "evidence in the record strongly supports the validity and reliability of the expert evidence on this issue." Noting that the defendant's challenge was a broad challenge "to the general area of expertise and methodology," the court observed that the defendant did not challenge the specific conclusions of the two fingerprint experts in this case. Assessing the reliability of the ACE-V method, the court noted "that the testing of the procedure may fall short of the type required by certain sciences" but ruled that any deficiency in the testing did not preclude admission of the testimony. The court also concluded that the lack of peer-reviewed research and a known error rate did not bar admission of the testimony. The court relied heavily on the facts "that fingerprint analysis has been used by law enforcement for approximately 100 years and that the rate of error is extremely low." Finally, the court determined that, despite an article exhibited to the hearing by the defense, fingerprint evidence has been widely accepted in the law enforcement community and by numerous courts of law.

At trial, Mr. Crenshaw testified that "an identifiable fingerprint is a lot different from a fingerprint. Most fingerprints are not identifiable." He said that a number of factors could affect the clarity of a fingerprint. He testified that he was a certified fingerprint examiner and that all of his fingerprint identification training had been law enforcement related. Like Mr. Schade, he was subject to re-certification every five years. Regarding the uniqueness of individual fingerprints, Mr. Crenshaw said that the database to which he had access contained "over two million fingerprints" and that no two were alike. Additionally, the FBI database contained 250 million prints, none of which were identical. His testimony regarding the ACE-V method mirrored that of Mr. Schade. Mr. Crenshaw emphasized that it was not his desire to make an incorrect identification, saying,

[I]f I'm not 100 percent sure a fingerprint is a match, I will not make it. There's been plenty of times where I thought one was a match, I've been pressured to make that match, but I will not make that match. One erroneous match – erroneous identification, I lose my certification, probably lose my job, and I risk sending an innocent person to jail. I will not do that.

After he discovered the bank envelope in C.C.'s 4Runner, he sprayed it with ninhydrin, which "reacts with the sweat, amino acids" left behind in fingerprints. He then obtained an identifiable print from the envelope, and he processed the print through a database. He then made the match by examining the print on the envelope and the known print identified in the digital search. He identified the print as having been made by the defendant.

He also conducted fingerprint testing of the trash bags that contained C.C.'s body. He said that "one of the best methods to obtain fingerprints from plastic" was to "expose them to cyanoacrylate vapors, which is Super Glue vapors." He photographed the print exposed by that process and then compared that print with the known prints. A palm print on the most exterior trash bag belonged to the defendant. He said that the placement of the palm print on the bag was consistent with "someone lifting the bag, 'cause pressure would have to be applied on the opposite side of the surface." He did not find any identifiable prints on the two most interior garbage bags or the white bag that had been around C.C.'s head.

Mr. Crenshaw identified the defendant's fingerprint on "a shoe store . . . pay stub with" C.C.'s name "hand written on the back." He also identified the defendant's fingerprint on some photographs that were collected from the Chipman Street residence.

In this appeal, the defendant again challenges the admissibility of the expert testimony on fingerprint evidence offered by Mr. Schade and Mr. Crenshaw, claiming deficiencies in the methodology behind the fingerprint identifications made in this case.

The admissibility of expert testimony is governed by Rules 702 and 703 of the Tennessee Rules of Evidence. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). Rule 702 addresses the need for expert testimony and the qualifications of the expert, *see* Tenn. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."), and Rule 703 focuses on the reliability of expert opinion testimony, *see* Tenn. R. Evid. R. 703 ("The facts or data in the particular case

upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."). The admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and no reversal occurs on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2010); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

As indicated, the defendant attacked the methodology behind the expert testimony concerning fingerprint analysis in this case. Our supreme court, in *McDaniel*, identified a list of factors "[t]o assess methodological and foundational reliability":

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Scott*, 275 S.W.3d at 403-04 (citing *McDaniel*, 955 S.W.2d at 265). The court cautioned, however, that "[r]igid application of these factors is unnecessary" and that "[n]ot all expert testimony will 'fit' with these factors." *Scott*, 275 S.W.3d at 404 (citing *Copeland*, 226 S.W.3d at 302; *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005)).

In support of his position, the defendant again cites the 2009 publication by the National Research Council that questioned the validity and reliability of the ACE-V method of fingerprint analysis. *See* Committee on Identifying the Needs of the Forensic Science Community, National Research Council, *Strengthening Forensic Science in the United States: A Path Forward* 143 (2009). Challenges made to the validity of the ACE-V method, including those made in the wake of the National Research Council publication, have already

been rejected by a number of the federal courts of appeals and the high courts of other states. *See, e.g.*, *United States v. Herrera*, 704 F.3d 480, 486 (7th Cir. 2013) ("Matching evidence of the kinds that we've just described, including fingerprint evidence, is less rigorous than the kind of scientific matching involved in DNA evidence; eyewitness evidence is not scientific at all. But no one thinks that only scientific evidence may be used to convict or acquit a defendant."); *United States v. Watkins*, 450 Fed. Appx. 511, 516 (6th Cir. 2011) (observing that "even a less-than-perfect fingerprint-identification method can still be scientifically valid"); *United States v. Scott*, 403 Fed. Appx. 392, 398 (11th Cir. 2010) ("The ACE-V method has been in use for over 20 years, and is generally accepted within the community of fingerprint experts."); *United States v. Pena*, 586 F.3d 105, 110-11 (1st Cir. 2009) (stating that the district court did not abuse its discretion by permitting expert testimony that was based on the ACE-V method); *United States v. Baines*, 573 F.3d 979, 983, 989-92 (10th Cir. 2009) (same); *United States v. Mitchell*, 365 F.3d 215, 221-22, 246 (3d Cir. 2004) (same); *United States v. Crisp*, 324 F.3d 261, 266-70 (4th Cir. 2003) (upholding admission of fingerprint evidence and noting that "[f]ingerprint identification has been admissible as reliable evidence in criminal trials in this country since at least 1911"); *United States v. Havvard*, 260 F.3d 597, 600-02 (7th Cir. 2001) (testimony concerning latent fingerprint examination was properly admitted); *Commonwealth v. Patterson*, 840 N.E.2d 12, 32-33 (Mass. 2005) (finding ACE-V method reliable for single latent fingerprint impressions).

We agree with the conclusions expressed by other courts presented with this issue. That the ACE-V methodology lacks an element of peer review or a known error rate does not preclude the testimony of Messrs. Schade and Crenshaw in this case. Additionally, as noted by the United States Court of Appeals for the Tenth Circuit, "[W]hile we acknowledge that acceptance by a community of unbiased experts would carry greater weight, we believe that acceptance by other experts in the field should also be considered. And when we consider that factor with respect to fingerprint analysis, what we observe is overwhelming acceptance." *Baines*, 573 F.3d at 991. We agree with the trial court that fingerprint identification can be classified as a type of hybrid forensic evidence because it requires scientific, technical, and experiential knowledge. Both Mr. Crenshaw and Mr. Schade testified that despite their significant training, it was their experience that best served them when trying to make a fingerprint identification. Fingerprint evidence has been used in criminal trials in this country for well over 100 years, and although it has not proven entirely infallible, it has certainly not proved so unreliable that expert testimony about fingerprint identification should be excluded from evidence.

We conclude that the trial court did not err by admitting the testimony of Messrs. Schade and Crenshaw. Importantly, the trial court allowed the defendant to cross-examine the witnesses regarding the ACE-V method and its application in this case. The

defendant is not entitled to relief on this issue.

## *VII.  Ballistics Testing*

The defendant next contends that the trial court erred by denying his motion in limine to exclude testimony concerning the ballistics testing conducted in this case on grounds that the report prepared by the ballistics examiner established that the testing led to inconclusive results.  The defendant, again citing the 2009 National Research Council publication, also challenged the admission of ballistics testing testimony on grounds that such testing was not scientifically reliable.

At the pretrial hearing, KPD firearms examiner Patricia Resig testified that she had bachelor's degrees in nursing and anthropology in addition to the two-year's training she had in firearm and toolmark examination.  She explained that she made comparisons between bullets, between cartridge cases, and between bullets or cartridge cases and firearms.  That analysis was primarily based upon visual examination of the physical characteristics of the items to be compared.  She said that she began with an examination of the "class characteristics" or "design features" of a particular firearm, bullet, or cartridge case.  These included "caliber, number of lands and grooves, the direction of twists, the measurements of those lands and grooves, and as far as cartridge cases or the gun marking of cartridge case, . . . firing pin impressions, breech face marks, location and shape of extractor marks and ejector marks."  The "class characteristics" could lead to the elimination of a particular firearm but would not result in a positive identification.  "To make an identification," she said, "I base my decision on the individual characteristics, and these are unintentional imperfections, irregularities of tool surfaces that actually make the gun, the barrel[,] or the breech face."  She said that these characteristics are "unique to that gun or that barrel."  She said that a positive identification required "sufficient agreement of those individual characteristics."

Ms. Resig testified that the field of firearms examination had itself been subjected to scientific review and testing.  That testing verified the reliability of firearms examination.  She said that many labs participated in proficiency testing of their examiners and that the testing established error rates of between .9 percent and .1 percent.  She explained that although some literature suggested an error rate as high as 12 percent, "that included inconclusives which are neither correct nor incorrect."  Ms. Resig documented her results using "notes, drawings, sketches, charts, and a very large part on photography."  In this case, she consulted with the "TBI firearm and toolmark unit," which confirmed the identifications she made.

In this case, Ms. Resig examined one .22-caliber High Standard model Sentinel

-44-

R-103 double-action revolver, one .22 long-rifle caliber Clerke double-action revolver, six .22 long-rifle caliber Remington cartridges, and a .3- M1 caliber Universal semi-automatic carbine with a detachable magazine. She test fired two bullets through the Sentinel revolver and compared them with the bullets recovered from C.N.'s body during the autopsy. She said that the bullets "displayed similar class characteristics . . . but there was a lack of agreement or disagreement of the individual characteristics." Those same class characteristics would be shared by a number of other revolvers. As a result, her final finding was inconclusive "[a]s far as comparing the bullets from the victim to the Sentinel revolver." She said that although the bullets fired from the Clerke revolver and the test bullets shared the same class characteristics, there was enough disagreement between the individual characteristics for her to eliminate the Clerke revolver as the murder weapon. She was able to determine two of the bullets recovered from C.N.'s body were fired from the same unknown weapon, but she could not determine whether the third had been fired from the same weapon, in part because that bullet was damaged.

During cross-examination, Ms. Resig testified that the Association of Firearm and Toolmark Examiners offered a certification program but that she was not certified by that organization. Additionally, she said that the American Society of Crime Laboratory Directors required proficiency testing for firearms examiners, but the KPD was not accredited by that organization. Instead, the KPD was accredited by "CLIA . . . which is a commission on accreditation for law enforcement agencies."

Ms. Resig explained that "there was a study from 1978 through 1991 where an error rate of 12 percent was reported for firearms and 26 percent error rate reported for toolmarks, but . . . included within that percentage were inconclusive results, which are neither . . . correct or not correct." "[T]aking out those inconclusive results and if you strictly look at it as a function of the incorrect responses, then the error rate is much less."

At the conclusion of the hearing, the defendant argued that Ms. Resig's conclusion that the Sentinel revolver and the bullets recovered from C.N.'s body shared the same class characteristics was "not probative of anything in this case," that it "proves nothing, and it is the quintessential basis for a potential for juror confusion under 403."

At the conclusion of the hearing, the trial court observed that "what we have here is . . . bullets that are fired from a weapon that have these . . . characteristics that place it within the realm of being . . .in that class of weapons that could have fired these bullets." The court added, "[W]hen you balance all of that out, and . . . it's subject to full cross-examination, and it's subject to the limitations for what it is, . . . that it has tendency to make the existence of a fact of some consequence." The court concluded that Ms. Resig's testimony was relevant and that it would not confuse the jury, observing, "[I]t may not be the

weapon. But it's a factor that they can weigh and consider in their overall consideration here."

Regarding the defendant's challenge to Ms. Resig's testimony pursuant to Evidence Rules 702 and 703, the court concluded that "Ms. Resig credibly testified to the various *McDaniel* factors." The court found that the record "clearly establishes the more than satisfactory qualifications of Patricia Resig as an expert in the field of ballistics" and "that the evidence strongly supports the admission" of her testimony. The court observed that the defendant's challenge utilizing the conclusions in the National Research Council report "more appropriately will go to the weight of the evidence rather than its admissibility."

The defendant reiterates his challenges to Ms. Resig's testimony on appeal, and we again agree with the conclusions of the trial court. Ms. Resig testified that her testing established that the test bullets fired from the Sentinel shared the same class characteristics as two of the bullets recovered from C.N.'s body, which meant that the bullets could have been fired from that weapon, but that she was unable to determine conclusively whether the bullets recovered from C.N.'s body had been fired by the Sentinel. She was able to determine that the bullets "probably" were not fired from the Clerke revolver. We find this testimony relevant despite its relatively low probative value. Additionally, this evidence, as presented by Ms. Resig, did not possess the potential to confuse the jury. She carefully explained that she could not positively identify the Sentinel as the murder weapon. She was also subjected to rigorous cross-examination on this point.

Utilizing the standards discussed in our analysis of the defendant's challenge to the testimony of Messrs. Crenshaw and Schade, we conclude that the trial court did not abuse its discretion by admitting Ms. Resig's testimony. Ms. Resig's testimony established that she was qualified to offer expert testimony in ballistics examination and testing and that the methods used to test the bullets and firearms in this case were those widely accepted within the scientific community. She testified, and the trial court observed, that ballistics testing has been subjected to scientific review, which review has revealed a low rate of error. That the National Research Council suggested different or improved standards did not render the methods used here so unreliable as to prohibit Ms. Resig's testimony. The defendant is not entitled to relief on this issue.

*VIII. Buttons Depicting Victims*

The defendant asserts that the trial court erred by permitting members of the victims' families to wear buttons depicting the victims before their deaths. Prior to trial, the defendant moved the trial court to prohibit the introduction of victim-impact evidence during the guilt-phase of his trial, specifically asking the trial court to prevent spectators from

wearing "buttons, shirts, or other displays of the victims' images in the courtroom."

After hearing the arguments of the parties and examining one of the buttons that the victims' families intended to wear, the court observed,

> I think that . . . these are two victims in this matter who obviously can't be here, and their families . . . are here on their behalf. And, you know, they've lost these people, and I think it is appropriate for them to be here. There's no mystery who they are. There's no mystery about . . . who's here on behalf of the defendants in any given case, and . . . while I do not think it's appropriate for there to be some show of support in the sense of bringing in a delegation of people who obviously have a point of view about a case one way or the other, I do think it's appropriate for family members to be able to represent lost family members by being able to tastefully represent them by wearing . . . some memorabilia of them.

The court ruled that the immediate family of both victims, "the mother, the father, the siblings, . . . grandparents, " would be allowed to "wear a tasteful memorabilia of their lost family members." The court emphasized that its ruling did "not extend to their friends and family. It does not extend to the extended family. I think that there's a limit, but I think that it's appropriate for the immediate family to be able to express their remembrance of their lost loved ones." The court also ruled that no one would be permitted "to wear anything on the witness stand." The court continued,

> The fact remains and it's undisputed that they've lost a child, and to deny them the opportunity to be able to express that loss by wearing a tasteful display of a remembrance of that child makes no sense to me, and I don't think for one second that it's going to make any difference to this jury in their decision-making process about whether or not the state can prove beyond a reasonable doubt whether a particular individual is or is not responsible for any crime that they're charged with in this case.

The court noted that it "anticipated . . . a tasteful button with a photograph of . . . the individual as a young adult, that they would be able to wear on their lapel or . . . in that vicinity." The court also added that once a button had been decided upon, individuals should "wear the same button . . . . So we don't have to worry day-to-day what we're talking about."

In a later-issued written order, the trial court clarified its oral ruling:

This Court recognizes that in order to provide the defendant with a fair trial, the courtroom atmosphere must be free of coercion or intimidation. This Court will closely monitor and supervise the courtroom throughout the trial in this matter, including spectator conduct, to ensure that no such coercive or intimidating atmosphere exists. Had the victims in this case survived, they would be permitted in the courtroom for trial. In their absence, this Court finds that the immediate family members of the victims may wear the small buttons provided to the Court at the April 17, 2009[] hearing at trial. No other images of the victims will be displayed by spectators in the courtroom. Immediate family members will include the victim's parents, siblings, and grandparents only. In addition, no witness may wear the button on the witness stand. This Court notes that in reaching this determination it is aware that jurors are aware of their surroundings and the fact that some spectators are biased toward the defendant while others are biased toward the state. Small buttons such as those provided here, and limited to the small number of persons who will be permitted to wear them, will be a sign of nothing more than the normal grief occasioned by the loss of a family member and will in no way brand the defendant with a mark of guilt in the eyes of the jurors. In addition, this court finds that these limited buttons will not create an atmosphere of coercion or intimidation at the trial court.

The members of the victims' immediate families abided by the terms of the court's ruling, removing their buttons when called to testify and wearing the same button already approved by the trial court. Following Ms. Resig's testimony, however, the trial court observed, out of the presence of the jury, that "there are some additional buttons on . . . some people in the audience. The ruling of the Court is that the buttons that can be worn, can be worn by immediate family members. So let's remember that." No other mentions of the buttons were made during the trial.

On appeal, the defendant argues that the trial court erred by permitting any spectator to wear the button.

The Supreme Court "has recognized that certain courtroom practices are so

inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006) (citing *Estelle v. Williams*, 425 U.S. 501, 503-06 (1976); *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986)). In *Musladin*, "a state court held that buttons displaying the victim's image worn by the victim's family during [Musladin's] trial did not deny respondent his right to a fair trial," and the Supreme Court concluded that the state court holding was not "contrary to or an unreasonable application of clearly established federal law." *Musladin*, 549 U.S. at 72. "During Musladin's trial, several members of [the victim's] family sat in the front row of the spectators' gallery. On at least some of the trial's 14 days, some members of [the victim's] family wore buttons with a photo of [the victim] on them." *Id.*

In *Williams* and *Flynn*, the Court "dealt with government-sponsored practices" that were "so inherently prejudicial that they must be justified by an 'essential state' policy or interest." *Id.* at 75. The *Musladin* Court determined that the practice at issue in *Williams* — compelling "the defendant to stand trial in prison clothes" — "'further[ed] no essential state policy.'" *Id.* (citing *Williams*, 425 U.S. at 505). In *Flynn*, the Court determined that the seating of four state troopers "immediately behind the defendant" did not have "to be justified by an 'essential state interest.'" *Musladin*, 549 U.S. at 75 (citing *Flynn*, 475 U.S. at 568-69). The Court concluded that neither ruling addressed itself to the determination of "the effect on a defendant's fair-trial rights of . . . spectator conduct," noting that it had "never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Musladin*, 549 U.S. at 76. The Court observed that "although the Court articulated the test for inherent prejudice that applies to state conduct in *Williams* and *Flynn*," it had "never applied that test to spectators' conduct." *Id.* The court noted that "part of the legal test of *Williams* and *Flynn*--asking whether the practices furthered an essential state interest--suggests that those cases apply only to state-sponsored practices." *Id.*

Noting its own "lack of guidance" on this issue, the Court observed that "lower courts have diverged widely in their treatment of defendants' spectator-conduct claims," with some applying the *Williams* and *Flynn* standard to spectators' conduct, some declining to extend that standard beyond state-sponsored conduct, and some ruling "on spectator-conduct claims without relying on, discussing, or distinguishing *Williams* or *Flynn*." *Musladin*, 549 at 76-77 (citations omitted).

In his concurring opinion, Justice Kennedy concluded that the rule established by the Court's earlier precedents "require[d] a court, on either direct or collateral review, to order a new trial when a defendant shows his conviction has been obtained in a trial tainted by an atmosphere of coercion or intimidation similar to that documented in the foregoing cases" regardless of "whether the pressures were from partisans, or . . . from persons reacting

to the drama of the moment who created an environment so raucous that calm deliberation by the judge or jury was likely compromised in a serious way." *Id.* at 80-81 (Kennedy, J., concurring). Justice Souter, also concurring in the opinion, reasoned that the "inherently prejudicial" standard of *Williams* and *Flynn* clearly "reache[d] the behavior of spectators" and concluded that "one could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations," observing that "the buttons are at once an appeal for sympathy for the victim (and perhaps for those who wear the buttons) and a call for some response from those who see them." *Id.* at 83 (Souter, J., concurring). He added, "On the jurors' part, that expected response could well seem to be a verdict of guilty, and a sympathetic urge to assuage the grief or rage of survivors with a conviction would be the paradigm of improper consideration." *Id.* Justice Souter stopped short, however, of concluding "that any level of risk from wearing buttons in a courtroom is unacceptable." *Id.*

In the wake of *Musladin*, most courts have concluded that although the wearing of memorial buttons at trial carries a risk of prejudicing the defendant's right to a fair trial, the practice is not inherently prejudicial. *See, e.g.*, *State v. Iromuanya*, 806 N.W.2d 404, 432 (Neb. 2011) (concluding that "the wearing of victim memorial buttons by spectators at a criminal proceeding" was not the same "as state-sponsored procedures showing a probable deleterious effect on fundamental rights and calling for close judicial scrutiny"); *Allen v. Commonwealth*, 286 S.W.3d 221, 229 (Ky. 2009) (declining "to conclude that the wearing of such clothing or buttons in the courtroom is so inherently unfair as always to constitute reversible error"); *State v. Lord*, 165 P.3d 1251, 1253-54 (Wash. 2007) ("A simple picture button, a sign of support or sympathy that does not expressly advocate guilt or innocence, does not alone impermissibly bias a jury."). We agree with the rationale expressed in these cases. Unlike forcing a defendant to stand trial in prison garb, *see Estelle*, 425 U.S. at 503, 505 (holding that threat to the "fairness of the factfinding process" created by forcing a defendant to appear in prison garb must be justified by an "essential state policy"), or to appear in shackles, *see Deck v. Missouri*, 544 U.S. 622, 629 (2005) (holding that "the use of physical restraints visible to the jury" is permissible only when the trial court determines that "they are justified by a state interest specific to a particular trial"), the wearing of memorial buttons that display photographs of the victims does not "'undermine[] the physical indicia of innocence'" or "'the related fairness of the fact-finding process.'" *Mobley v. State*, 397 S.W.3d 70, 100 (Tenn. 2013) (quoting *Deck*, 544 U.S. at 630). Consequently, because the wearing of memorial buttons by courtroom spectators does "not automatically present an unacceptable risk . . . of impermissible factors coming into play," *see Lord*, 165 P.3d at 1254 (citations and internal quotation marks omitted), the determination whether to permit spectators to wear memorial buttons lies most properly within the sound discretion of the trial court. We make this conclusion mindful that it is the duty of the trial court to control the proceedings and "that a trial judge has broad discretion in controlling the course and conduct

of the trial." *See, e.g.*, *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). The trial judge, who sees the buttons, the courtroom, and the jurors first hand, is in the best position to determine the potential impact of the buttons on the defendant's right to a fair trial. *See Deck*, 544 U.S. at 629 (emphasizing "the importance of preserving trial court discretion" in matters of courtroom decorum). In this case, the trial court utilized a measured approach when making the decision to allow the victims' immediate family members to wear the buttons at issue here. The court carefully crafted a rule designed to limit the negative impact of the buttons and rigorously enforced its ruling during trial. Under these circumstances, we cannot say that the trial court abused its discretion.

*IX. Interception of Privileged Communications*

The defendant asserts that the trial court erred by refusing to dismiss the presentment following the discovery that the State had intercepted a letter from the incarcerated defendant addressed to his counsel. The State avers that the trial court did not err.

Prior to trial, the defendant moved the trial court to dismiss the presentment on grounds that the State had violated his Sixth Amendment right to counsel by intercepting privileged communications between the defendant and his attorneys. The defendant noted that correspondence from the defendant, who was in jail, to his counsel had been opened, copied, reviewed by members of the district attorney's office and reproduced in the discovery materials provided to all the parties.

At the hearing on the defendant's motion, Knox County Sheriff's Office ("KCSO") Officer Frank P. Nauss, Jr., the "gang intelligence officer in the mailroom" of the Knox County Detention Center, testified that in 2008, "homeland security division" Officer Hugh Williams instructed Officer Nauss to "censor" the defendant's mail, which meant he was to copy all of the defendant's mail and send a copy to Officer Williams. He said that he was to copy "everything except legal mail," which he described as "off-limits" and "irrelevant." Every item he copied was forwarded to Officer Williams and Investigator Tom Walker. He acknowledged that the request for copies of the defendant's mail came from the district attorney general's office.

When "censoring" mail, Officer Nauss typically opened the letters from the inmate and copied the contents. He then returned the contents to the envelope and resealed it before sending it on to the intended recipient. He insisted that he did not read the contents while copying the letters. His process, he said, changed "around July 1st of 2008" due to an increase in "the sheer volume of copies" that he was asked to make. At that point, Officer Williams instructed him to "pull the mail, look at it as needed, look at the documentation –

the letter as needed and then copy anything that [Officer Nauss] thought was – would be of interest to homeland security."

On February 21, 2008, Officer Nauss "processed and copied" an envelope from the law firm of Eldridge & Blakney that was addressed to the defendant and marked "personal and confidential." On April 23, 2008, Officer Nauss opened and copied one letter addressed to and three letters from the defendant, including legal mail. All the copies were sent to KCSO homeland security department.

Officer Nauss testified that he could not answer the question why the defendant's legal mail had been opened and copied when it was his practice to avoid tampering with legal mail. He said that he "just did not catch it" when he opened the defendant's legal mail. He maintained that he had not intentionally copied the defendant's legal mail. The same thing happened, he said, when he accidentally opened and copied legal correspondence between Vanessa Coleman and her attorney. He insisted that he had not been instructed to copy legal mail and claimed that he copied Ms. Coleman's mail only because he did not recognize the name of her attorney. Officer Nauss said that after Officer Williams realized that a piece of legal mail had been copied, he alerted the district attorney general's office. He was then instructed to shred his copy of the letter and prepare a memorandum recounting the situation.

KCSO Officer Hugh Williams testified that shortly after the defendant's arrest, the district attorney general's office instructed him to monitor the defendant's mail and that his instructions strictly forbade the intercepting of legal mail. He identified a letter addressed to the defendant's counsel that was intercepted in April 2008 and said that "[i]t stands to reason that" he had reviewed the letter in the course of his duties. He said that the letter would have been copied and the copy forwarded to the district attorney general's office. A copy of the letter would also be retained in his office.

Although Officer Williams could not recall the specific contents of the April 2008 letter, he said "for a fact that it was nonconsequential [sic], whatever it was," or he would have remembered it, "especially on a case of this magnitude." He said that he had, "[o]n occasion," discussed the contents of the defendant's mail with members of the district attorney general's office. He could not explain how the April letter had come to be copied given that it was obviously legal mail. He said that he was "absolutely flabbergasted" that his office "had made a mistake, and this is obviously a mistake."

In the letter, which was exhibited to the hearing, the defendant asked his counsel to obtain photographs and bring them to him at the detention center. He also raised questions regarding the potential handling of Daphne Sutton's trial testimony and the

handling of the motion to suppress evidence obtained via the first search warrant executed at the Chipman Street residence. The defendant specifically referenced his personal knowledge of information revealed during the federal carjacking trial of Eric Boyd.[11]

The parties stipulated that a member of the district attorney general's office read the letter intercepted on April 23, 2008.

The defendant argued that the State's interception and the prosecution's reading of the letter violated his First and Sixth Amendment rights and that the only appropriate remedies available to the trial court were dismissal of the presentment or recusal of the Knox County District Attorney General's Office. The State acknowledged that the defendant's legal mail had been intercepted but claimed that the interception was inadvertent. The State argued that the appropriate remedy was suppression of any information gleaned from the erroneous interception. The prosecutor adamantly asserted that the letter had not altered the State's theory of the case. Finally, the State averred that the defendant could not establish that he had been prejudiced by the interception.

At the conclusion of the hearing, the trial court accredited the testimony of Officers Nauss and Williams, finding that "they testified truthfully," "that this was not an intentional action on their behalf in copying this letter," "that they are aware of the fact that this is privileged communication," and "that there was a mistake made here that they readily admit and were embarrassed by." The court also concluded that although the letter was reviewed by someone in the district attorney general's office, "it created no particular interest on their behalf over there" because "it was nothing of any great significance." The court observed that the fact that the communication was disseminated in the discovery materials for all those charged in this case indicated that the State was "unaware of the fact that they had in their possession a communication from a defendant to his lawyer." The court noted that, despite that all the defense lawyers involved had been in possession of the letter since June 2008, "the first time that anybody has heard anything about this is the first week of October of 2009 when, apparently, . . . you got looking at what you had in your file." The court said, "[M]y point of all that is, is that this is not something that – that caused a great deal of concern . . . it was not something that jumped out as a matter of great concern." The court commented that "it certainly appears that it affected in no way anybody's preparation for the trial of this case." The court emphasized that the letter was "confined to a very specific issue at a very specific time, which . . . is not of major import one way or the other."

_____

[11]A federal jury convicted Eric Boyd of "being an accessory after the fact to a carjacking leading to serious bodily injury and death[] and (2) misprision of a felony" for providing aid to the defendant and helping him elude authorities following the discovery of the victims' bodies. *United States v. Boyd*, 640 F.3d 657, 662 (6th Cir. 2011).

The court concluded,

> So it seems to me that although there's no question that this was a privileged communication between a client and attorney that the information that's discussed in this communication is not information that is going to prejudice the defendant in the preparation or presentation of the case. I think all of that preparation has already been done, that everything that has transpired up until last week was done without any reference to or interference by this communication. I don't think it affects the way that the [S]tate is going to present their case or the way that the defendant is going to defend their case.
>
> The only thing that the Court can do, in my judgment, is as the trial progresses, determine whether or not during the course of the trial anything that . . . arises that in my judgment is influenced in any way by the contents of this communication, and if it is, I'll fashion a remedy that I think is appropriate at the time. . . .
>
> . . . I believe it is an inadvertent, unintentional breach on behalf of the Knox County Sheriff's Department, but it is a breach. I do not believe that the appropriate remedy in this case is dismissal of the case.

On appeal, the defendant contends that "the interception and review of this correspondence between [the defendant] and his counsel violated the attorney client privilege, [the defendant's] access to the courts, right to the assistance of counsel, and right to free speech." He argues that the only appropriate remedy is reversal of his conviction. The State acknowledges that the defendant's legal mail should not have been opened and read but maintains that the trial court did not err by refusing to dismiss the presentment or recuse the Knox County District Attorney General's Office because the action was unintentional and because it resulted in no prejudice to the defendant.

To be sure, correspondence between the defendant and his counsel should not have been opened and read by members of the KCSO outside the defendant's presence and should not have, in any case, been copied and shared with the district attorney general's office. *See Wolff v. McDonnell*, 418 U.S. 539, 576-77 (1974) (recognizing Sixth Amendment protection for inmate legal correspondence but approving prison policy of opening legal mail in the inmate's presence so long as the mail is not read). Outside of those cases indicating

-54-

a complete deprivation of the right to counsel, Sixth Amendment violations "are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). Indeed, "certain violations of the right to counsel may be disregarded as harmless error." *Id.* at 365. Absent proof that "the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," "there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." *Id.*

In this case, the record contains no evidence to suggest that the reading of the single letter from the defendant to his counsel that was exhibited to the hearing resulted in any prejudice. The letter did not divulge any defense strategy and did not, based on the record before us, result in the presentation of tainted evidence at the defendant's trial. Under these circumstances, the trial court did not err by denying the defendant's motion. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) ("There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion . . . , there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.").

## X. Thirteenth Juror

The defendant asserts that the second successor trial judge erred by concluding that the issue of witness credibility was not significant enough to prevent his acting as thirteenth juror in this case. The State avers that the second successor trial judge did not err by fulfilling the role of thirteenth juror.

As indicated, before the hearing on the defendant's motion for new trial, the trial judge "resigned from the bench after pleading guilty to one count of official misconduct." *See Rule 10 Order,* slip op. at 1. The first successor trial judge initially "determined that he could not perform the thirteenth-juror review because the credibility of the original trial judge had been called into question by his misconduct outside the courtroom," *id.*, slip op. at 2, but our supreme court concluded that the trial judge's credibility was irrelevant to the determination whether the first successor trial judge could act as thirteenth juror, and the court remanded the case for the first successor trial judge to reassess his ability to perform the required statutory review, *see id.*, slip op. at 4. Upon remand, the first successor trial judge again concluded that he could not act as thirteenth juror, citing witness credibility as a determining factor in the defendant's case. The defendant unsuccessfully sought recusal of the first successor trial judge, and, upon Rule 10 review, this court reversed the denial of the defendant's recusal motion and ordered the first

successor trial judge recused. The second successor trial judge determined that witness credibility was not so significant in this case that it prevented his performing thirteenth juror review. It is this ruling the defendant now appeals.

Tennessee Rule of Criminal Procedure 33 provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(d). This rule has been deemed "the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." *State v. Blanton,* 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). We have observed that "the rule 'imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment.'" *State v. Biggs*, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (quoting *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995)). Criminal Procedure Rule 25 provides that when the trial judge cannot perform his role as thirteenth juror due to "absence, death, sickness, or other disability," "any judge regularly presiding in or who is assigned to a court may complete the court's duties." Tenn. R. Crim. P. 25(b)(1). If a successor trial judge "concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason," the successor judge may grant a new trial. Tenn. R. Crim. P. 25(b)(2).

This court must "review a successor judge's decision about whether he can act as the thirteenth juror under a de novo standard of review." *State v. Justin Ellis*, ___ S.W.3d ___, No. E2011-02017-SC-R11-CD, slip op. at 22 (Tenn. Jan. 13, 2015). "[T]he key factor for a successor judge to consider in her analysis of whether she can act as the thirteenth juror is the extent to which the credibility of one or more material witnesses is actually a significant aspect of the case." *Id.*, slip op. at 15; *see also Biggs*, 218 S.W.3d at 654 (stating that a successor judge "first exposed to the case when called to preside over a motion for new trial may rule on the motion if the record is available as long as witness credibility is not an overriding issue" and "may not approve the judgment and must grant a new trial" in those cases with "witness credibility [as] the primary issue raised in the motion for new trial"). "[M]ost of the specific credibility factors" to be examined "may be evaluated from the transcript of the witness' testimony and the testimony of others about the witness, as well as from information that may be contained in trial exhibits." *Justin Ellis*, ___ S.W.3d at ___, slip op. at 17. The successor trial judge "should indulge a rebuttable presumption that" he can fulfill the role of thirteenth juror and should decline to do so "[o]nly if the record indicates that weighing the evidence would require an assessment of witness demeanor." *Id.*, slip op. at 23.

In this case, the second successor judge entered a thorough and cogent order

on the thirteenth juror issue. He observed that the physical evidence in this case supported the defendant's convictions. Specifically, the judge noted that the defendant's DNA was discovered in C.C.'s vagina and rectum and on her jeans, contradicting the defendant's statement that he did not have sex with C.C.; that the defendant's fingerprints were discovered on three of the five trash bags used to contain C.C.'s body; and that the defendant possessed property belonging to both victims. The judge acknowledged the defense theory that C.C. engaged in consensual sexual activity with the defendant when the victims came to the Chipman Street residence to purchase drugs and that the others charged in this case were responsible for the torture and murders of the victims, but the court characterized these theories as "rank speculation" that "totally ignore[]" the defendant's own statement and the physical evidence in the case. The judge also noted that the defendant did not raise the issue of witness credibility in his closing argument or his motion for new trial.

The second successor judge "certifie[d]" that he had "thoroughly familiarized himself, read, and viewed the records, exhibits, and read the transcripts of this case" and determined "that the issue of witness credibility is **not** the primary issue in this case, nor the overriding issue in this case." The court found that "physical evidence, forensic evidence, and unrefuted facts unequivocally supported" the defendant's convictions "over and above any determination of the credibility of the live witnesses who testified at trial."

Following our de novo review, we conclude that weighing the evidence in this case for purposes of thirteenth juror review did not require "an assessment of witness demeanor" and that, as a result, the second successor judge did not err by finding that he could act as thirteenth juror. We note that the defendant did not testify at trial. The defendant posits that "[a] comparison of the respective theories" of the parties establishes that "the credibility of key witnesses was a primary issue." Part of the defendant's theory of the case was that C.C. engaged in consensual sexual relations with the defendant. Unfortunately for the defendant, however, the record contains absolutely no evidence to support the defendant's claim; indeed, in the defendant's own pretrial statement, he denied having had any sexual contact with C.C. The evidence in this case overwhelmingly established that the victims were kidnapped, robbed, raped, tortured, and murdered, and the physical evidence tied the defendant inextricably to those crimes.

*XI. Sufficiency*

The defendant claims that the evidence adduced at trial was insufficient to support any of his convictions. The State argues that the defendant has waived our consideration of this issue by failing to support it with argument. We agree that, other than making bare assertions of insufficiency, the defendant has failed to support his claim with argument. Given the magnitude of the case, however, we choose to assess the sufficiency

of the convicting evidence despite that the defendant's challenge could be deemed waived. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

The jury found the defendant guilty of eight alternative counts of the felony murder of C.N., eight alternative counts of the felony murder of C.C., one count of the premeditated murder of C.N., and one count of the premeditated murder of C.C. At the conclusion of the guilt phase, the trial court merged the felony murder verdicts into a single count for each victim. After the jury imposed a sentence of death, the trial court merged the verdicts of felony murder and premeditated murder into a single conviction of first degree murder for each victim. The jury also found the defendant guilty of two counts of especially aggravated robbery, four counts of aggravated kidnapping, nine counts of the aggravated rape of C.C., three counts of facilitation of aggravated rape of C.N., one count of theft of property valued at $10,000 or more but less than $60,000, and one count of theft of property valued at less than $500. The trial court effectuated merger that resulted in two convictions of especially aggravated robbery, two convictions of aggravated kidnapping, three counts of aggravated rape, and one count of facilitation of aggravated rape.

When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, *see* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *see State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) ("[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence."). Especially inimical to the defendant's claim is the well-rooted axiom that the appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Also, the credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Importantly, we afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another" and "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . rape, robbery, burglary, theft, kidnapping." T.C.A. § 39-13-

202(a)(1)-(2) (2006). As used in the statute,

> "premeditation" is an act done after the exercise of reflection
> and judgment. "Premeditation" means that the intent to kill
> must have been formed prior to the act itself. It is not necessary
> that the purpose to kill pre-exist in the mind of the accused for
> any definite period of time. The mental state of the accused at
> the time the accused allegedly decided to kill must be carefully
> considered in order to determine whether the accused was
> sufficiently free from excitement and passion as to be capable of
> premeditation.

*Id.* § 39-13-202(d). Noting that "[p]roof of premeditation is inherently circumstantial," this
court has observed that "[t]he trier of fact cannot speculate what was in the killer's mind, so
the existence of premeditation must be determined from the defendant's conduct in light of
the circumstances surrounding the crime." *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim.
App. 2007)*; see also State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App.,
Nashville, Jan. 5, 1996) (citing LaFave and Scott, *Substantive Criminal Law* § 7.7 (2d ed.
1986)). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may
look to the circumstances surrounding the killing, *see, e.g.*, *State v. Bland*, 958 S.W.2d 651,
660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001), including "the
use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing;
declarations by the defendant of an intent to kill; evidence of procurement of a weapon;
preparations before the killing for concealment of the crime[;] and calmness immediately
after the killing." *Bland*, 958 S.W.2d at 660.

"Especially aggravated robbery is robbery as defined in § 39-13-401 . . .
[a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily
injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property
from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a).

"Especially aggravated kidnapping is false imprisonment, as defined in §
39-13-302: . . . [a]ccomplished with a deadly weapon or by display of any article used or
fashioned to lead the victim to reasonably believe it to be a deadly weapon . . . or . . . [w]here
the victim suffers serious bodily injury." *Id.* § 39-13-305(a)(1), (4).

As charged in this case, "[a]ggravated rape is unlawful sexual penetration of
a victim by the defendant or the defendant by a victim" when (1) "[f]orce or coercion is used
to accomplish the act and the defendant is armed with a weapon"; (2) "[t]he defendant causes
bodily injury to the victim"; or (3) "[t]he defendant is aided or abetted by one (1) or more

other persons and . . . [f]orce or coercion is used to accomplish the act." "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a).

The evidence in this case established that the defendant and others who were charged in this case initially encountered the victims in the parking lot of the apartment complex where the couple were preparing for an evening out. The perpetrators took C.C.'s car at gunpoint, forcing both C.C. and C.N. to go with them. The next day, C.N.'s partially burned body was discovered on the railroad tracks near the Chipman Street residence. An autopsy established that he had been beaten, raped, forced to walk barefoot over gravel, and shot three times. C.C.'s body was later discovered inside the defendant's Chipman Street residence stuffed inside a trash can. An autopsy established that she had been beaten and raped before being stuffed into five trash bags and then the trash can. That her cause of death was asphyxiation indicated that she was alive when placed in the trash can to die. DNA analysis established the presence of the defendant's semen in C.C.'s vagina and rectum and on her blue jeans. Mr. Cobbins' DNA was found in C.C.'s mouth, on her tank top, sweater, and blue jeans and on the floral fabric used to bind C.C. Analysis of the rape kit performed on C.N.'s body established the presence of semen in C.N.'s rectum, but the only DNA profile identified in that sample belonged to C.N. Items belonging to both victims were later found in the defendant's possession or inside the Chipman Street residence. Indeed, at some point the defendant gave some of C.C.'s clothing to his estranged girlfriend. The jury, as was its prerogative, rejected the defense theory that the defendant engaged in consensual sex with C.C., that he took no part in the criminal offenses committed against the victims, and that the

victims were tortured and killed by the others charged in this case. Under these circumstances, the evidence overwhelmingly supports the defendant's convictions.

## XII. Presentment

The defendant makes two challenges to the presentment in this case: (1) that the presentment was "constitutionally insufficient" because it did not "properly specify the time, place, and a description of the occurrence of the alleged offenses" and (2) that the presentment failed to charge the elements of criminal responsibility. The State asserts that the presentment sufficiently apprised the defendant of the charges against him and that the failure to include the elements of criminal responsibility in the presentment did not render it deficient.

The presentment in this case charged the defendant, George Thomas, Letalvis Cobbins, and Vanessa Coleman with the following offenses, which, the presentment alleged, occurred "[o]n or about the ___ day of January, 2007":

| Count | Charge |
|-------|--------|
| 1 | Felony murder of C.N. in the perpetration of the robbery of C.N. |
| 2 | Felony murder of C.N. in the perpetration of the robbery of C.C. |
| 3 | Felony murder of C.C. in the perpetration of the robbery of C.N. |
| 4 | Felony murder of C.C. in the perpetration of the robbery of C.C. |
| 5 | Felony murder of C.N. in the perpetration of the kidnapping of C.N. |
| 6 | Felony murder of C.N. in the perpetration of the kidnapping of C.C. |
| 7 | Felony murder of C.C. in the perpetration of the kidnapping of C.N. |
| 8 | Felony murder of C.C. in the perpetration of the kidnapping of C.C. |
| 9 | Felony murder of C.N. in the perpetration of the rape of C.N. |
| 10 | Felony murder of C.N. in the perpetration of the rape of C.C. |
| 11 | Felony murder of C.C. in the perpetration of the rape of C.N. |
| 12 | Felony murder of C.C. in the perpetration of the rape of C.C. |
| 13 | Felony murder of C.N. in the perpetration of the theft of property from C.N. |

| | |
|---|---|
| 14 | Felony murder of C.N. in the perpetration of the theft of property from C.C. |
| 15 | Felony murder of C.C. in the perpetration of the theft of property from C.N. |
| 16 | Felony murder of C.C. in the perpetration of the theft of property from C.C. |
| 17 | Premeditated murder of C.N. |
| 18 | Premeditated murder of C.C. |
| 19 | Especially aggravated robbery (violence and putting in fear) of C.N. (serious bodily injury and use of a weapon) |
| 20 | Especially aggravated robbery (violence and putting in fear) of C.C. (serious bodily injury and use of a weapon) |
| 21 | Especially aggravated kidnapping (deadly weapon) of C.N. |
| 22 | Especially aggravated kidnapping (serious bodily injury) of C.N. |
| 23 | Especially aggravated kidnapping (deadly weapon) of C.C. |
| 24 | Especially aggravated kidnapping (serious bodily injury) of C.C. |
| 25 | Aggravated anal rape of C.N. "forcibly, while armed with a weapon" |
| 26 | Aggravated anal rape of C.N. "coercively, while armed with a weapon" |
| 27 | Aggravated anal rape of C.N. with "bodily injury" |
| 28 | Aggravated anal rape of C.N. "forcibly . . . while being aided and abetted by one or more persons to the Grand Jurors unknown" |
| 29 | Aggravated anal rape of C.N. "coercively . . . while being aided and abetted by one or more persons to the Grand Jurors unknown" |
| 30 | Aggravated anal rape of C.C. "forcibly, while armed with a weapon" |
| 31 | Aggravated oral rape of C.C. "forcibly, while armed with a weapon" |
| 32 | Aggravated vaginal rape of C.C. "forcibly, while armed with a weapon" |
| 33 | Aggravated anal rape of C.C. "coercively, while armed with a weapon" |
| 34 | Aggravated oral rape of C.C. "coercively, while armed with a weapon" |

| 35 | Aggravated vaginal rape of C.C. "coercively, while armed with a weapon" |
|----|------|
| 36 | Aggravated anal rape of C.C. with "bodily injury" |
| 37 | Aggravated oral rape of C.C. with "bodily injury" |
| 38 | Aggravated vaginal rape of C.C. with "bodily injury" |
| 39 | Aggravated anal rape of C.C. "forcibly . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 40 | Aggravated oral rape of C.C. "forcibly . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 41 | Aggravated vaginal rape of C.C. "forcibly . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 42 | Aggravated anal rape of C.C. "coercively . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 43 | Aggravated oral rape of C.C. "coercively . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 44 | Aggravated vaginal rape of C.C. "coercively . . . while being aided or abetted by one or more persons to the Grand Jurors unknown" |
| 45 | Theft of property valued at $500 or less from C.N. |
| 46 | Theft of property valued at $10,000 or more but less than $60,000 from C.C. |

Each of the counts tracked the language of the relevant statute and contained an appropriate statutory citation.

### A. Sufficiency of the Presentment

Prior to trial, the defendant moved the trial court to dismiss the presentment on grounds that it was insufficient in providing sufficient detail to allow the defendant to defend the charges. The trial court denied the motion in summary fashion.

Challenges to the legal sufficiency of a presentment present questions of law subject to de novo review on appeal. *See State v. Wilson*, 31 S.W.3d 189, 191 (Tenn. 2000); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *State v. Davis*, 940 S.W.2d 558, 561 (Tenn.

1997).

"[T]he Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation." *Hill*, 954 S.W.2d at 727; *State v. Berry*, 141 S.W.3d 549, 561 (Tenn. 2004) ("The overriding purpose of an indictment is to inform the accused of 'the nature and cause of the accusation.'"). "[T]he touchstone for constitutionality is adequate notice to the accused." *Hill*, 954 S.W.2d at 729. Additionally, Tennessee Code Annotated section 40-13-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

T.C.A. § 40-13-202 (2006). As a general rule, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Hill*, 954 S.W.2d at 729 (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)).

"It is generally sufficient for the indictment to state the offense charged in the words of the statute." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010); *see also State v. Carter*, 121 S.W.3d 579, 587 (Tenn. 2003) ("[A]n indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of *Hill*."); *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *State v. Carter*, 988 S.W.2d 145, 148 (Tenn. 1999); *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998) ("[W]here the constitutional and statutory requirements outlined in *Hill* are met, an indictment which cites the pertinent statute and uses its language will be sufficient to support a conviction."). "[A]n indictment need not allege the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000).

Here, the defendant concedes that the presentment includes a "description of the date and a recitation of the statutes," and we observe that each count contains an appropriate statutory reference. Nothing more is required.

Regarding the defendant's claim that the presentment was insufficient because it failed to allege a date beyond "the ___ day of January, 2007," Code section 40-13-207 provides:

> The time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment, unless the time is a material ingredient in the offense.

T.C.A. § 40-13-207; *see also Byrd*, 820 S.W.2d at 740 (stating that "the exact date, or even the year, of an offense need not be stated in an indictment or presentment unless the date or time 'is a material ingredient in the offense.'" (citations omitted)); *Bosley v. State*, 401 S.W.2d 770, 772 (Tenn. 1966) ("It is the well settled law of this state that an indictment in a case of this character . . . that shows that the offense the defendant is alleged to have committed occurred prior to the date of indictment is sufficient."). Our courts have repeatedly ruled that inclusion of the month and year of an offense in the indictment is sufficient. *See, e.g.*, *State v. Shaw*, 82 S.W. 480 (Tenn. 1904) (stating that "where there is no statute of limitations barring the offense, it is unnecessary to state the day, or even the year, but it is sufficient to aver generally that the offense was committed before the finding of the indictment; that it is not necessary to state in any case the day on which the offense was committed, unless the day itself is of the essence of the offense").

With regard to his claim that the presentment should have stated a precise location of the offense, Code section 40-13-208 provides: "It is not necessary for the indictment to allege where the offense was committed, but the proof shall show a state of facts bringing the offense within the jurisdiction of the county in which the indictment was preferred." T.C.A. § 40-13-208. We have observed that "[i]n the context of indictments, the place of the offense is typically considered a matter of form rather than of substance." *State v. Gerald L. Powers*, No. W1999-02348-CCA-R3-DD, slip op. at 13 (Tenn. Crim. App., Jackson, Sept. 28, 2001) (citing *State v. Nixon*, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997)); *State v. Sowder*, 826 S.W.2d 924, 928 (Tenn. Crim. App. 1991) ("The indictment need not be specific regarding the time or place of the offense.").

### B. Criminal Responsibility

The defendant also contends that the presentment should have been dismissed because it "failed to allege the elements of criminal responsibility and facts in support thereof." The defendant is correct that the presentment contains no reference to the theory of criminal responsibility, but his claim that this omission voids the presentment is inapt. As

our supreme court explained in *State v. Sherman*, Code "[s]ection 39-11-402(2) does not prescribe a separate and distinct crime; rather, it works in synergy with the charged offense to establish a defendant's guilt through the actions of another." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). Importantly, "[a] separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense." *Sherman*, 266 S.W.3d at 408 (citing *Lemacks*, 996 S.W.2d at 170; *State v. Barnes*, 954 S.W.2d 760, 763 (Tenn. Crim. App. 1997)). This is because "[a]n indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173 (quoting *State v. Johnson*, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)). Thus, the presentment need not have alleged the theory of guilt via criminal responsibility for the acts of another.

## XIII.  Juror Questions

The defendant next contends that the trial court erred by informing the jurors that they could ask questions of the witnesses and by permitting the jurors to ask questions during the trial. He does not complain about any specific question posed by a particular juror but instead asserts that the practice has no place in a capital trial.

Rule 24.1 of the Tennessee Rules of Criminal Procedure provides that the trial court "may permit a juror to ask a question of a witness" and provides a procedure for the submission of juror questions:

(1) Written Submission of Questions.

The juror shall put the question in writing and submit it to the judge through a court officer at the end of a witness' testimony. A juror's question shall be anonymous and the juror's name shall not be included in the question.

(2) Procedure After Submission.

The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.

-66-

(3) Jury Instructions.

When juror questions are permitted, the court shall instruct jurors early in the trial about the mechanics of asking a question and to give no meaning to the fact that the judge chose not to ask a question or altered the wording of a question submitted by a juror.

Tenn. R. Crim. P. 24.1(c). The purpose of the rule is "to assist jurors in their understanding of evidence and to make them feel more involved in the trial process." *Id.*, Advisory Comm'n Comments. Although once described as "a perilous practice which trial courts should scrupulously avoid," *Branch v. State*, 469 S.W.2d 533, 534 (Tenn. Crim. App. 1969), the practice of permitting jurors to pose questions to witnesses is no longer disfavored in this state, *see State v. James*, 315 S.W.3d 440, 458 (Tenn. 2010) (observing that the adoption of Rule 24.1 "changed that policy"). A reviewing court will not find error "[a]bsent a clear abuse of the discretionary authority of the trial judge, one that manifestly prejudices the rights of a defendant." *James*, 315 S.W.3d at 460.

Here, the trial court denied the defendant's pretrial motion to prohibit the jurors from submitting questions and then followed the procedure set forth in Rule 24.1 for the handling of juror questions during the trial. The defendant cites no authority for the proposition that Rule 24.1 is inapplicable to capital trials, and we find none. Under these circumstances, we cannot say that the trial court abused its discretion by permitting jurors to submit questions.

*XIV. Jury Deliberations*

The defendant claims that the trial court erred by allowing the jury to review the defendant's video-recorded statement in open court during its deliberations, arguing that the procedure erroneously opened the deliberations to the public. The State contends that the trial court committed no error.

During its deliberations, the jury sent a note the to the trial court asking to review the defendant's recorded statement. The trial court informed the parties that it had decided to allow the jury to review the statement in the courtroom because "it's better to do it on the big screen. So that we're here to see exactly what they see and so that they can see the caption and make sure that the equipment runs properly." The court stated its opinion that "since it's being done in the courtroom that it is a public proceeding." The court told the spectators that they could remain in the courtroom but admonished them to make no comment and to refrain from showing any reaction to the video. Following the defendant's

objection to the court's allowing the courtroom to remain open, the trial court observed that "the jury is not going to deliberate in the sense that they're going to have any discussions in the courtroom. The only thing that's going to occur is that we're going to bring them back . . . for the purpose of viewing this video." The court emphasized that the video recording was "an exhibit that can only be appropriately viewed by the jury in the courtroom." The court then brought the jury into the courtroom, where they viewed a portion of the statement and then retired to the jury room.

Rule 30.1 of the Tennessee Rules of Criminal Procedure provides: "Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. "This rule changes the long-standing practice in Tennessee of not allowing the jury in criminal cases to take the exhibits to the jury room for their study and examination during deliberations." *Id.*, Advisory Comm'n Comments. In our view, the rule speaks more to the jury's nearly unfettered access to trial exhibits than to the location of their access. *See id.* ("This rule, applicable in criminal cases, is mandatory unless the judge, either on motion of a party or sua sponte, determines that an exhibit should not be submitted to the jury. Among the reasons why a particular exhibit might not be submitted are that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury."). That said, we do not believe that the trial court should have required the jury to review the recording in open court in the presence of not just the parties but the spectators. The better practice would have been to show the jury how to operate the equipment in the courtroom and then leave them to review the recording on their own. *See State v. Jikinte Lashane Morris*, No. M2005-02909-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Nashville, Feb. 26, 2007) ("It would have been preferable for the judge and the officer whose agency owned the equipment to instruct the jury as to how to use the equipment and then excuse themselves from the courtroom."). Because the record contains no evidence that this procedure prejudiced the defendant in any way, however, we conclude that the error was harmless.

## XV. Composition of Jury Venire

Prior to the trial, the defendant moved the court to dismiss the presentment on grounds that the juror selection process resulted in the jury venire's being unconstitutionally composed. The trial court summarily denied the motion, and the defendant now appeals, claiming that "the structure of the jury selection process . . . and the compensation rate for jurors made it so the jury venire, the grand jury, and the petit jury were not composed of a fair cross section of the community." Specifically, he argues that "the jury selection process systematically excluded distinctive groups within the community" and that "the

compensation authorized to be paid to jurors does not even provide the minimum wage . . . and therefore makes it practically impossible for wage laborers and persons caring for young children to serve on the jury."

It is important that the defendant's issue be appropriately cast. His challenge is solely to "the *potentially* arbitrary and discriminatory method used to select the grand and petit juries in his case." (Emphasis added). To "establish a prima facie violation of the fair-cross-section requirement," however, a

> defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Although he claims that the method of venire selection affected the grand and petit juries that heard his case, the defendant presented no proof that those groups he alleges were excluded from the venire[12] were "distinctive" within the community. Additionally, he did not establish that the representation of the identified groups was "not fair and reasonable in relation to the number of such persons in the community." Indeed, he offered no proof of the number of members of the identified groups on the venire versus the number of those persons in the community. Finally, the defendant offered no proof that any underrepresentation of the identified groups was "due to systematic exclusion." Instead, he points to the Code sections governing jury selection and compensation, a 2005 study from the University of Wisconsin-Milwaukee titled "The Driver License Status of the Voting Age Population in Wisconsin," and the United States Election Commission clearinghouse website. The defendant correctly asserts that both the state and federal constitutions guarantee the right to an impartial jury selected from a fair cross-section of the community, but he has failed to establish that he was actually deprived of those constitutional guarantees.

Moreover, our supreme court, considering a direct challenge identical to the one presented by the defendant, approved the method of juror selection utilized in Knox County:

---

[12]The groups identified by the defendant were "minorities and poor populations" along with "wage laborers and persons caring for young children."

The defendant insists that the method used by the Knox County Jury Commission to select the jury pool denied defendant a fair and impartial cross section of the community. The Commission selected prospective jurors solely from the lists of registered voters. The defendant argued that this excluded the class of those who are not registered to vote and introduced evidence, largely held incompetent and irrelevant by the court, to show that those who do not register to vote are less wealthy and less educated than those who do register and that over a quarter of the city population and almost one-third of the county population are not registered to vote.

The method used by the Commission has been impliedly approved by the Tennessee courts, although it may be that the list should be supplemented with some other source of names. In the federal system voter registration lists are the preferred method. Several federal cases approve the use of such lists in choosing juries and note that those complaining must still show that the method results in the systematic exclusion of a cognizable group from the jury source. The defendant here has shown no discrimination, either racial or sexual, by the Commission; in fact it is not even shown that any cognizable group has been excluded. In *Test*, the court noted that voter registration lists provide a large and easily accessible source of names, to which all potential jurors have equal access and which disqualifies jurors solely on the basis of objective criteria. The defendant has not proved any constitutional invalidity in the method of jury selection in this case.

*State v. Caruthers*, 676 S.W.2d 935, 939 (Tenn. 1984) (citations omitted). The high court has also specifically approved the use of driver's license records to select potential jurors, noting that it found "no material difference between the use of a list of registered voters and the use of a list of registered drivers." *State v. Mann*, 959 S.W.2d 503, 535 (Tenn. 1997). The defendant is not entitled to relief on this issue.

### XVI.  Death Penalty Related Issues

#### A.  Economic Costs of the Death Penalty

The defendant raises two issues related to the economic costs of the death

penalty in this state. He first asserts that the trial court erred by refusing to allow him to present proof during the penalty phase about the costs associated with implementing the death penalty. Prior to trial, the defendant filed a motion seeking permission to present evidence that first degree murder trials where death is a potential punishment cost more than those where death is not a potential punishment and that the cost of executing an inmate is greater than the cost of imprisoning an inmate for the entirety of his life. In support of his motion, the defendant pointed to the questionnaires returned by potential jurors in this case, which revealed that 76 percent of potential jurors believed that it costs more to imprison an individual for life than it does to execute an individual. The trial court denied the defendant's motion but offered the following to the jury before giving the jury charge:

> Ladies and gentlemen, one of the issues that . . . was in your questionnaire and one of the issues that had come up related to economic costs of sentencing issues, and . . . we did not get into that during the proof in this case. But what I've agreed to do at the request of and with the agreement of the parties is to make this following statement to you with regard to economic costs as it relates to the death penalty and as it relates to life imprisonment.

> There was a study by the [C]omptroller of the [S]tate of Tennessee that was done, and what that study showed is that the economic costs of . . . imposing the death penalty . . . is more expensive than imprisoning somebody for life without parole. Now that's one study done by the [C]omptroller of the [S]tate of Tennessee.

> Now, having said that, I want you to understand that the economic cost[] . . . should have absolutely no bearing on your decision in this case. What you should base your decision on in this case is the evidence that's presented to you, the law that we tell you that applies on how you should make your decision, and the weight to be given the evidence that's presented to you.

> We just . . . don't want people to operate under any . . . , misguided misperceptions [sic] about . . . economics so that's why I told you that.

> But I want to stress to you that you are to make your decision in this case solely on the . . . evidence that's presented

to you, the law that we tell you that applies, and those are the things that are important to how you decide what's appropriate in this case. I'm going to leave it here, okay.

The defendant claims on appeal that the trial court's ruling and its instruction to the jury deprived him of the right to present mitigation evidence. The State argues that because the economic costs of the death penalty bear no relation to the defendant or his crime, evidence of the same was irrelevant and properly excluded by the trial court. We agree with the State.

Tennessee Code Annotated section 39-13-204 provides, in pertinent part, as follows:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment, and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee. . . .

T.C.A. § 39-13-204(c). An accused facing the death penalty has the constitutional right to present evidence of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), but this right does not "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense," *id.* n.12; *see also State v. Odom*, 928 S.W.2d 18, 31 n.10 (Tenn. 1996) (noting that "evidence that does not bear on the defendant's character, prior record or the circumstances of the offense is not relevant and may be excluded by the trial court"). Indeed, "'[t]he primary concern in the Eighth Amendment context has been that the sentencing decision be based on *the facts and circumstances of the defendant, his background, and his crime.*'" *State v. Dellinger*, 79

S.W.3d 458, 473 (Tenn. 2002) (quoting *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990)) (emphasis added).

Those courts to consider the issue have concluded that evidence of the economic costs of imposing the death penalty is not relevant to the issue of punishment and, as such, can be properly excluded from a capital sentencing hearing. For example, in *State v. Clabourne*, the Arizona Supreme Court cited as error the sentencing court's decision to permit Clabourne to utilize the cost of imposing the death penalty as a mitigating factor because "the economic cost of the death penalty is unrelated to Clabourne, his character or record, or the circumstances of his offense." *State v. Clabourne*, 983 P.2d 748, 757 (Ariz. 1999). The *Clabourne* court observed, "The cost/benefit analysis of the death penalty is a decision left to the legislature in the first instance, and to the State in any given case." *Id.*; *see also State v. Bell*, 33 A.3d 167, 180 (Conn. 2011) (stating that the economic costs associated with a particular punishment "are to be considered not by the sentencing authority but by the legislature when it is enacting sentencing provisions").

In our view, the trial court did not err by refusing to allow the defendant to introduce evidence regarding the cost of imposing the death penalty compared to the cost associated with imprisoning an individual for life. Evidence of the expense associated with implementing the death penalty bore no relation to the defendant or his crimes, and as such, it was irrelevant.

In a related issue, the defendant contends that the "enormous economic costs" associated with the death penalty render it unconstitutional, arguing that "given the substantial expense of imposing the death penalty as compared to a sentence of incarceration for life without parole, the [S]tate does not have a compelling interest in the continued use of capital punishment."

Regardless of the costs associated with implementing the death penalty, the responsibility of weighing the economic costs associated with continuing the death penalty in this State lies solely with the general assembly, not with this or any other court. We cannot fathom a situation in which the potential financial burden on Tennessee taxpayers associated with implementing the death penalty could result in the finding of a violation of the death-sentenced inmate's constitutional protection against cruel and unusual punishment.

### B. *Death Qualified Jurors*

The defendant next asserts that the trial court erred by excluding from the jury those individuals who expressed that they could not impose the death penalty for religious or other reasons. As the State correctly points out, our supreme court has repeatedly

approved of the process of death qualifying the jury by excluding those individuals on the extremes, those who would flout the law and "always" or "never" vote for the death penalty regardless of the evidence. *See, e.g., State v. Sexton*, 368 S.W.3d 371, 391 (Tenn. 2012); *State v. Teel*, 793 S.W.2d 236, 246 (Tenn. 1990). The defendant's attempt to shoehorn this claim into a violation of the fair cross-section requirement does not alter our decision. The defendant is not entitled to relief on this issue.

### C. Constitutionality of the Death Penalty

Finally, the defendant raises a number of separate but related challenges to the constitutionality of the death penalty in general and the death penalty as it was imposed in this case. He argues that these flaws should have resulted in the dismissal of the death notice in this case.

### 1. Sufficient Narrowing

He first contends that Code section 39-13-204 "does not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death" in violation of constitutional protections. He claims that the (i)(5), (i)(6), (i)(7), and (i)(13) aggravating circumstances, each of which was found by the jury in this case, are unconstitutionally vague and do not achieve a constitutionally sufficient narrowing. Again, as the State correctly points out, the supreme court has considered and rejected arguments identical to those presented by the defendant.

The defendant claims that the (i)(5) aggravating factor, that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death," T.C.A. § 39-13-204(i)(5), does not sufficiently narrow the class of death-eligible murderers because "a person of ordinary sensibility could fairly characterize almost every murder as involving the infliction of severe physical or mental pain." Our supreme court has "consistently upheld the constitutionality of [the (i)(5)] aggravating circumstance" and has "rejected the argument that the terms are vague or overbroad." *See Terry v. State*, 46 S.W.3d 147, 159 (Tenn. 2001).

The defendant claims that the (i)(6) aggravating circumstance, that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," T.C.A. § 39-13-204(i)(6), is unconstitutional as "significantly expanded" by our supreme court's ruling in *State v. Coe*, 655 S.W.2d 903 (Tenn. 1989). Specifically, he complains that the expanded definition afforded to the (i)(6) aggravating circumstance by the ruling in *Coe* actually encroaches upon the underlying justification for the (i)(7) aggravating circumstance, which justification is,

according to the defendant, "to deter 'witness killings.'"  We are unpersuaded by any part of the defendant's argument.  Our supreme court "has consistently recognized that [the (i)(6)] aggravating circumstance requires that a motive for the killing must have been avoiding, interfering with, or preventing an arrest or prosecution.  There is nothing vague or overbroad about this aggravating circumstance."  *State v. Banks*, 271 S.W.3d 90, 152 (Tenn. 2008) (citation omitted).  The (i)(7) aggravating circumstance does not require that the murder be "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," *see* T.C.A. § 39-13-204(i)(6), and instead requires that the murder was "knowingly committed . . . while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any" of the enumerated felonies, *see id.* § 39-13-204(i)(7).  The provisions are not duplicative.  *See Banks*, 271 S.W.3d at 153.  Additionally, as our supreme court observed in *Banks*, "Even assuming, for the sake of argument, that the aggravating circumstances are duplicative, Mr. Banks has failed to demonstrate or explain why this duplication would undermine their constitutionality."  *Id.*

The defendant also invites this court "to take a second look" at the rationale underlying those supreme court cases specifically approving the application of the (i)(7) aggravating circumstance to convictions of felony murder.  Our supreme court has recently and specifically concluded that "pursuant to established precedent on this issue . . . the (i)(7) aggravating circumstance sufficiently narrows the pool of death-eligible defendants."  *State v. Pruitt*, 415 S.W.3d 180, 227 (Tenn. 2013).  Thus the defendant's is an invitation we must decline.  *See generally Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976) (holding that the adjudications of the supreme court "are final and conclusive upon all questions determined by it, subject only to review, in appropriate cases by the Supreme Court of the United States.").

Finally, the defendant alleges that the (i)(13) aggravating circumstance, that "[t]he defendant knowingly mutilated the body of the victim after death," T.C.A. § 39-13-204(i)(13), is unconstitutionally vague.  This court explained the (i)(13) aggravating circumstance in *State v. Price*.  Although "the term 'mutilate' is not defined anywhere in our statutory code," we held that because the (i)(13) aggravating circumstance "specifically addresses itself to mutilation of a victim after death, the only logical conclusion to be drawn regarding the legislative intent underlying that section is that the General Assembly . . . meant to discourage corpse desecration."  *State v. Price*, 46 S.W.3d 785, 827-28 (Tenn. Crim. App. 2000).  The *Price* court utilized the definitions of the term "mutilate" found in Black's Law Dictionary and Webster's New International Dictionary:

> Black's Law Dictionary defines "mutilation" as follows:  "2. Criminal law.  The act of cutting off or *permanently damaging*

> a body part, especially an essential one." Black's Law
> Dictionary 1039 (7th ed. 1999). Webster's defines "mutilate"
> as: "1: to cut off *or permanently destroy* a limb or essential part
> of . . . . 2: to cut up or *alter radically so as to make imperfect*
> . . . ." Webster's New International Dictionary, 1493 (3d ed.
> 1993).

*Id.* at 827 (emphasis in *Price*). Our supreme court later approved this definition of the term. *State v. Jordan*, 325 S.W.3d 1, 71 (Tenn. 2010). Our supreme court has never declared this aggravating circumstance unconstitutional.

### 2. Weighing of Aggravating and Mitigating Factors

The defendant argues that Code section 39-13-204 is unconstitutional because it does not sufficiently direct the jury's discretion inasmuch as it permits the jury to "impose a death sentence no matter what mitigation is shown." He also complains that the language of Code section 39-13-204 deprives the jury of the power "to make the ultimate determination that death is appropriate" because it requires that the jury impose a sentence of death if it finds that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

> Code section 39-13-204(g)(1) provides:
>
> The sentence shall be death, if the jury unanimously determines
> that:
>
> > (A) At least one (1) statutory aggravating circumstance
> > or several statutory aggravating circumstances have been proven
> > by the state beyond a reasonable doubt; and
>
> > (B) Such circumstance or circumstances have been
> > proven by the state to outweigh any mitigating circumstances
> > beyond a reasonable doubt.

T.C.A. § 39-13-204(g)(1). The plain language of the statute reveals the fallacy in the defendant's argument. The Code does not permit the imposition of a death sentence "no matter what mitigation is shown" but only permits the jury to impose a sentence of death when it concludes that the established aggravating circumstances "have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt." *Id.* This language also does not mandate a sentence of death. *See State v. Howell*, 868 S.W.2d 238,

258 (Tenn. 1993). Moreover, as the defendant acknowledges, the Supreme Court has held that "complete jury discretion" in the consideration of aggravating and mitigating circumstances "is constitutionally permissible." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). Our own supreme court has expressly approved of Code section 39-13-204(g), concluding that it did not interfere with the jury's discretion. *See Howell*, 238 S.W.2d at 258-59. The defendant is not entitled to relief on this issue.

### 3. Mercy

The defendant asserts that Code section 39-13-204 is unconstitutional because it does not permit the jury to impose a sentence of life out of mercy. Again, our supreme court has specifically rejected this argument, concluding that the ability to act out of mercy is incorporated into the jury's ability to find any non-statutory mitigating circumstance. *See State v. Melson*, 638 S.W.2d 342, 366 (Tenn. 1982) (observing that "the idea that 'mercy' could be extended to a defendant is incorporated in the instructions on mitigating factors; and the admonition against being ruled by passion or prejudice runs throughout"); *see also e.g.*, *State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994).

### 4. Consequences of Deadlocked Jury

The defendant also claims that Code section 39-13-204 is unconstitutional because it prohibits the trial court from instructing the jury that the consequence of its failure to reach a verdict is the automatic imposition of a life sentence. He argues that this "tilt[s] the scales in favor of the prosecution and make[s] it easier to obtain the unanimous verdict required for death." Our supreme court has rejected this argument. *See, e.g.*, *State v. Simon*, 635 S.W.2d 498, 505 (Tenn. 1982) ("Such instructions are specifically prohibited by statutes dealing with the death penalty.").

### 5. Cruel and Unusual Punishment

The defendant contends that the death penalty in general and lethal injection in particular violate state and federal prohibitions on cruel and unusual punishment. Both of these arguments have been considered and rejected by the United States Supreme Court, *see Baze v. Rees*, 553 U.S. 35, 47 (2008) (reaffirming that "capital punishment is constitutional" and upholding Kentucky's lethal injection protocol), and our supreme court, *see, e.g.*, *Keen v. State*, 398 S.W.3d 594, 600 n.7 (Tenn. 2012) ("This Court has held, and repeatedly affirmed, that capital punishment itself does not violate the state and federal constitutions."); *Banks*, 271 S.W.3d at 108 (rejecting specific claim that lethal injection is cruel and unusual); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309(Tenn. 2005) ("[W]e conclude that the petitioner has failed to establish that the lethal injection protocol is cruel

and unusual punishment under the United States or Tennessee constitutions.").

### 6. Arbitrary and Capricious Application

The defendant argues that the death penalty in Tennessee has been implemented in an "arbitrary, capricious, and unconstitutional" manner.

He first claims that the "unlimited discretion" afforded to prosecutors to choose whether to seek the death penalty in a particular case violates his constitutional right to equal protection under the law, represents an improper delegation of judicial authority, and results in the usurping of legislative authority. "While Tennessee's district attorneys general have been entrusted with broad discretion in making charging decisions, it would be inaccurate to characterize their discretion as entirely unfettered." *Banks*, 271 S.W.3d at 154. Instead, their discretion is guided by the elements of the crime of first degree murder and the aggravating circumstances as defined by the legislature. "Furthermore, the United States Supreme Court has recognized that prosecutorial discretion provides a vehicle for individualized justice." *Banks*, 271 S.W.3d at 155 (citing *McCleskey v. Kemp*, 481 U.S. 279, 311-12 (1987)). Our supreme court has "repeatedly rejected the argument that such discretion raises a constitutional problem." *Banks*, 271 S.W.3d at 155.

The defendant also claims that "almost all" those sentenced to death are indigent. He does not even attempt to explain why this "fact" undermines the constitutionality of the death penalty except to include it in his discussion of the arbitrary application of the death penalty. He is not entitled to relief on this issue.

The defendant next contends that the implementation of the death penalty is racially discriminatory, citing information that 85 percent of death row inmates executed following *Furman* have been convicted of killing white victims. The single study cited by the defendant, however, "falls far short of the sort of exceptionally clear proof that would enable the courts to conclude that the actions of the decision-makers in his case were motivated by an improper discriminatory purpose." *Banks*, 271 S.W.3d at 157.

The defendant claims that "various studies suggest" that the likelihood of receiving a sentence of death depends on the geographic location of the crime, noting that Washington County juries have imposed the same number of death sentences as Davidson County juries despite that Davidson County has a significantly larger population. The defendant does not explain how the geographic distribution of death sentences undermines the constitutionality of the death penalty and cites no authority for his claim. He is not entitled to relief on this issue.

He also claims sexual discrimination in the implementation of the death penalty without explanation or citation to authority. He is not entitled to relief on this issue.

The defendant also reiterates his earlier claims about the selection process for capital juries and the costs associated with implementing the death penalty, attempting to recast them as equal protection violations. We have already addressed these claims and will not do so again.

### 7. Closing Arguments

As his next assignment of error, the defendant claims that allowing the State to make the final closing argument to the jury during the penalty phase violated his right to due process of law and the effective assistance of his counsel. He argues that although the State has the burden of establishing the aggravating circumstances beyond a reasonable doubt, "[t]he real burden is on the defendant whose life hangs in the balance, and he should have the opportunity to argue last." Our supreme court has previously considered and rejected this argument. *See, e.g.*, *Sexton*, 368 S.W.3d at 428.

### 8. Proportionality Review

The defendant contends "that the proportionality review process in this [s]tate is deficient and unconstitutionally inadequate." The proportionality review process has been developed and approved by our supreme court, *see Pruitt*, 415 S.W.3d at 212-17 (providing a discussion of the development of the comparative proportionality review process and specifically approving the constitutionality of the current process), and, as such, this court is without the authority to alter it, *see Barger*, 535 S.W.2d at 340.

### 9. Grand Jury Review

The defendant challenges both the death notice in this case and the aggravating factors found by the jury on grounds that neither was submitted for grand jury review. "The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment." *Banks*, 271 S.W.3d at 167 (citing *State v. Reid*, 164 S.W.3d 286, 312 (2005); *State v. Leach*, 148 S.W.3d 42, 59 (Tenn. 2004); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002)). The supreme court has also repeatedly held "that the provisions of Rule 12.3 satisfy the constitutional requirements of notice" such that grand jury review is not constitutionally required for death notices. *Berry*, 141 S.W.3d at 562 (citing *State v. Odom*, 137 S.W.3d 572 n.13; *Dellinger*, 79 S.W.3d at 467; *State v. Bush*, 942 S.W.2d 489, 520 (Tenn. 1997); *State v. Johnson*, 762 S.W.2d 110, 117

(Tenn. 1988)).

### 10.  Minimum Constitutional Standards

The defendant next asserts that the death penalty as implemented in this state fails to meet the minimum constitutional standards provided by the United States Supreme Court.  In reality, the defendant's claim is another rehashing of his opposition to the process of death qualifying capital juries.  We will not address this issue again.

### 11.  Due Process and Equal Protection

The defendant claims that the death penalty as implemented in this state violates his constitutional rights to due process and equal protection "by cutting off a defendant's post-conviction ability to establish his actual innocence."  He contends that the State effectively creates a statute of limitations for the presentation of an actual innocence claim by setting an execution date.  We fail to see how the availability of a future post-conviction claim undermines the constitutionality of the death penalty imposed in this case.  This is the direct appeal of the defendant's convictions and sentences.  He was afforded at trial the full and fair opportunity to defend himself against the charges.  Nothing more is required.  That other defendants in other cases may have established their innocence does not alter this result.

### XVII.  Victim Impact Evidence

Finally, the defendant contends that the presentation of victim impact evidence during the penalty phase violated his constitutional rights to due process and a fair trial.

Code section 39-13-204(c) provides that "[t]he court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons."  T.C.A. § 39-13-204(c).  Our supreme court has concluded that victim impact evidence is admissible in a capital sentencing hearing subject to the limitation that it "should be excluded if it 'threatens to render the trial fundamentally unfair or [if it] poses a danger of unfair prejudice.'" *Jordan*, 325 S.W.3d at 56 (quoting *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998)).  The defendant makes no claim that the victim impact evidence admitted during the penalty phase in his case violated these tenets and instead makes only broad, conclusory allegations regarding the constitutionality of the presentation of such evidence.  The constitutionality of presenting victim impact evidence in a capital sentencing hearing is a matter that has been settled by the state and federal supreme courts. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *Nesbit*, 978 S.W.2d at 891.

## XVIII.  Mandatory Review

Code section 39-13-206 mandates appellate court review of capital cases, which review must include a review of the sentence of death.  *See* T.C.A. § 39-13-206(b).

In reviewing the sentence of death for first degree murder, the reviewing courts shall determine whether:

> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

*Id.* § 39-13-206(c)(1).

### A.  Arbitrariness

Based upon our review of the record, we conclude that the sentences of death were not imposed in an arbitrary fashion in this case.  Instead, the sentences of death were imposed following the decision of a qualified petit jury that the State established the (i)(5), (i)(6), (i)(7), and, in the case of the murder of C.N., the (i)(13) aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

### B.  Aggravating Circumstances

In this case, the jury found the following enhancement factors applicable to the murders of both victims:  that the murders were "especially heinous, atrocious, or cruel, in that [they] involved torture or serious physical abuse beyond that necessary to produce death," *see* T.C.A. § 39-13-204(i)(5); that the murders were "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or

another," *see id.* § 39-13-204(i)(6); that the murders were "knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit" an aggravated robbery, aggravated kidnapping, aggravated rape, or theft, *see id.* § 39-13-204(i)(7). Additionally, with respect to the murder of C.N., the jury found that the defendant "knowingly mutilated the body of the victim after death." *See id.* § 39-13-204(i)(13).

With respect to the (i)(5) aggravating circumstance, the evidence established that C.N. was forced to walk barefoot over gravel, half-naked, to the railroad tracks where he suffered three gunshot wounds. C.C. was kept alive inside the Chipman Street residence and repeatedly sexually assaulted and beaten before she was stuffed, alive, into five trash bags and then a trash can. There she suffocated to death, even after, according to the defendant's own statement to the police, she asked not to die. In our view, this evidence overwhelmingly supports the application of this aggravating circumstance. *See State v. Blanton*, 975 S.W.2d 269, 281 (Tenn. 1998) ("We, therefore, hold that the torture prong of (i)(5) merely requires a jury finding that the victim remained conscious and sustained severe physical or mental pain and suffering between the infliction of the wounds and the time of death. Whether the defendant intended the victim's suffering is irrelevant under (i)(5)."); *Nesbit*, 978 S.W.2d at 887 ("There is no requirement that the cause or mode of death also be the cause or mode of the 'serious physical abuse beyond that necessary to produce death.' In this case, burns and bruises were inflicted upon the victim over a period of six hours. . . . The defendant burned the victim's body in various places and beat the soles of her feet before he shot her in the head."); *State v. Shepherd*, 902 S.W.2d 895, 906 (Tenn. 1995) ("[I]n this case there is proof that the victim suffocated after being buried alive. Such circumstances would warrant the jury making a finding of torture and depravity.").

With respect to the (i)(6) aggravating circumstance, the evidence established that the defendant and his accomplices kidnapped the victims in the parking lot of the Washington Ridge Apartments to avoid apprehension for the carjacking. C.N. was murdered shortly after the kidnappings, and C.C. was left to die immobilized inside the trash can after the perpetrators had sexually assaulted her. The defendant and his accomplices then fled the Chipman Street residence. From this evidence, a rational jury could have concluded beyond a reasonable doubt that the murders were committed for the purpose of avoiding apprehension.

With respect to the (i)(7) aggravating circumstance, the record amply establishes that the murders were committed in the perpetration of the robbery, kidnapping, and sexual assaults of both victims.

With respect to the (i)(13) aggravating circumstance, the evidence established

that authorities discovered C.N.'s half-naked body on the railroad tracks and that the body had been partially burned. This court has concluded that "destruction, in whole or in part, by fire is certainly one of the most offensive forms of corpse desecration. As such, we find that it falls within the purview of" the (i)(13) aggravating circumstance. *Price*, 46 S.W.3d at 828.

Having considered the evidence, we cannot say that the jury erred by finding the aggravating circumstances beyond a reasonable doubt. Proof of the aggravating circumstances in this case was simply overwhelming.

## C. Weight of the Aggravating and Mitigating Circumstances

Having concluded that the evidence overwhelmingly supported the finding of the (i)(5), (i)(6), (i)(7), and (i)(13) aggravating circumstances, we must next determine whether the evidence supported the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. In mitigation, the defendant presented proof of his violent and turbulent childhood and substance abuse. The proof of the utterly reprehensible nature of the murders in this case that undergirds the aggravating circumstances clearly outweighs this mitigating evidence, and we conclude that the jury did not err by concluding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.

## B. Proportionality Review

When a defendant has been sentenced to death, this court must undertake a comparative proportionality analysis. The process for our analysis was established in *State v. Bland* and reaffirmed recently in *Pruitt*. *Pruitt*, 415 S.W.3d at 207; *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997). "[C]omparative proportionality review 'presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime.'" *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 42-43 (1984)). A reviewing court employs "the precedent-seeking method of analysis, which requires the reviewing court to compare the case on appeal with other cases in which the defendants were convicted of the same or similar crimes." *Pruitt*, 415 S.W. 3d at 212-13 (citing *Bland*, 958 S.W.2d at 664). Pursuant to this method of review, the reviewing court "examines the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating circumstances involved" to " identify 'aberrant [death] sentences'" and does not "search for proof that a defendant's death sentence is perfectly symmetrical with others." *Pruitt*, 415 S.W.3d at 213 (quoting *Bland*, 958 S.W.2d at 665). The pool of cases to be utilized for "purposes of comparison

under the statute," include " those cases in which a capital sentencing hearing was conducted to determine whether the sentence should be death, life imprisonment without the possibility of parole, or life imprisonment, regardless of the sentence returned by the jury." *Pruitt*, 415 S.W.3d at 213 (citing *Bland*, 958 S.W.2d at 666).

Although there is no specific formula for comparing similar cases, this court must generally consider the following factors regarding the offense:

> (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims.

*Bland*, 958 S.W.2d at 667; *see also Pruitt*, 415 S.W.3d at 213. In addition, we must also consider the following factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *See Bland*, 958 S.W.2d at 667; *see also Pruitt*, 415 S.W.3d at 213-14.

> [E]ven within the framework established in *Bland*, "[c]omparative proportionality review is not a rigid, objective test." The reviewing court must also rely on the collective "experienced judgment and intuition" of its members. A death sentence is not deemed disproportionate "unless, the case taken as a whole is plainly lacking in circumstances consistent with those cases where the death penalty has been imposed."

*Pruitt*, 415 S.W.3d at 214 (quoting *Bland*, 958 S.W.2d at 668). We go forward with these principles in mind.

The evidence at trial established that the victims and C.C.'s 4Runner disappeared from the parking lot of the Washington Ridge Apartments on the evening of January 6, 2007. A train engineer discovered C.N.'s partially burned body on the railroad tracks near the defendant's Chipman Street residence on January 7, 2007; he had been shot. During the early morning hours of January 8, 2007, members of C.C.'s family located the

4Runner at the intersection of Chipman and Glider Streets only a short distance from the Chipman Street residence. Testing revealed the presence of the defendant's fingerprint on a bank envelope inside the 4Runner. Authorities later discovered C.C.'s body inside a trash can inside the Chipman Street residence; she had died of manual and positional asphyxiation. Autopsies established that both victims had been sexually assaulted, and the defendant's DNA was discovered inside C.C.'s vagina and rectum and on her blue jeans. His fingerprints were found on the trash bags used to suffocate C.C. Following his arrest, the defendant acknowledged having seen the victims at the Chipman Street residence and having driven the 4Runner but denied having committed any crime against the victims, blaming his accomplices.

At the time of the October 2009 trial, the African-American defendant was 28 years old. His criminal history included a prior conviction of aggravated robbery for which the defendant served a term of imprisonment in the department of correction. Although the defendant presented evidence that he had a troubled childhood that included sexual abuse and violence, no proof established that the defendant suffered from any specific mental, physical, or emotional condition that would have explained his participation in the offenses. The proof suggested that the defendant was a leader in the offenses, and in his own statement, the defendant admitted that C.C. told him she did not want to die. The defendant did not cooperate with authorities, and he expressed no remorse for the sufferings of the victims. Some proof presented by the defendant suggested that he would adapt well to the structured setting afforded by a sentence of life imprisonment without the possibility of parole.

The crimes in this case are unique in that they involve the robbery, kidnapping, and rape of two victims by the defendant and three others. Additionally, this case involves the execution-style murder of C.N. and the burning of his body as well as the suffocation death of C.C., including evidence that she lingered for some time while bound and gagged inside the trash can where she was left alone to die. The record suggests that both victims would have been aware of their impending fate, C.N. as he was being marched barefooted to the execution site at the railroad tracks and C.C. as she was stuffed into the trash can. This case may well set a high-water mark as one of cruelty and depravity.

Despite the uniqueness of this case, we have reviewed the circumstances of the present case with cases that include similar facts. Following our review, we conclude that the death penalty imposed in the present case is not excessive or disproportionate to the penalty imposed in other cases. *See, e.g.*, *State v. Reid*, 164 S.W.3d 286 (Tenn. 2005) (defendant kidnapped and stabbed two young employees to death following robbery of an ice cream store; jury imposed death penalty upon finding of (i)(2), (i)(5), and (i)(6) aggravating circumstances); *State v. Bush*, 942 S.W.2d 489 (Tenn. 1997) (79-year-old widow repeatedly stabbed to death in her home by defendant during a first degree burglary; jury

found (i)(5) and (i)(6) aggravating circumstances in imposing death sentence); *State v. Harris*, 839 S.W.2d 54 (Tenn. 1992) (32-year-old defendant murdered two employees of hotel during robbery; jury imposed sentences of death based upon (i)(2), (i)(5), and (i)(7) aggravating circumstances despite evidence of defendant's lack of education and troubled childhood); *State v. King*, 694 S.W.2d 941 (Tenn. 1985) (33-year-old defendant murdered the proprietor of a tavern during the course of a robbery; sentence of death upheld based upon (i)(2) and (i)(7) aggravating circumstances); *State v. Campbell*, 664 S.W.2d 281 (Tenn. 1984) (defendant murdered victim during course of a robbery and was sentenced to death upon finding of (i)(2), (i)(5), and (i)(7) aggravators); *State v. Coe*, 655 S.W.2d 903 (Tenn. 1983) (defendant kidnapped, raped and strangled eight-year-old, and jury found (i)(5), (i)(6), and (i)(7) aggravating circumstances); *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981) (defendant slit throat of elderly store clerk in the course of a robbery and was sentenced to death based on (i)(5) and (i)(7) aggravating factors).

*XIX. Merger*

In this case, the State charged the defendant with nine counts of first degree murder as to each victim, eight alternative counts of felony murder and one count of premeditated murder for the death of each victim. The State also charged the defendant with two alternative counts of especially aggravated kidnapping as to each victim, five alternative counts of the aggravated rape of C.N., and 15 alternative counts of the aggravated rape of C.C. Finally, the State charged the defendant with both especially aggravated robbery and theft for the taking of property from both victims. Prior to trial, the number of alternative aggravated rape counts as to C.N. was reduced to three and the number of aggravated rape counts as to C.C. was reduced to nine. The jury returned verdicts of guilty on all the first degree murder counts, both of the especially aggravated kidnapping counts, the especially aggravated robbery counts, the theft counts, all nine counts charging the aggravated rape of C.C., and for the lesser included offense of facilitation of aggravated rape on the three counts charging the aggravated rape of C.N. Although our case law allows jury verdicts of guilty on alternative theories of committing a single offense without requiring any election by the State, the verdicts must be merged into single judgments of convictions for each offense. *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011). The trial court in this case recognized the need for merger but did not properly effectuate it.

Because "it is the judgment of conviction that provides the legal authority for the executive branch of government to incarcerate a person who is sentenced to confinement," the "entry of only one judgment of conviction imposing only one sentence of . . . imprisonment" for each offense "protects the defendant from receiving multiple punishments for the same offense" in violation of principles of double jeopardy. *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (citing *State v. Vasser*, 870 S.W.2d

543, 546 (Tenn. Crim. App. 1993); Tenn. R. Crim. P. 32(e)).  The judgment imposing this single conviction and sentence must memorialize the guilty pleas or verdicts from the alternative counts and must state that these guilty pleas or verdicts are merged into the conviction effectuated by the judgment.  *See id.* (stating that the trial court's role in the face of guilty pleas or verdicts that must be merged into a surviving conviction is to "preserve . . . the same offense counts").  In this way, "the jury verdict [on the merged counts] stands as a legitimate finding of fact and law."  *Id.*  Thus, the "merger and imposition of *a single judgment of conviction* protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed 'charges' or 'convictions.'"  *Id.*  Accordingly, the appropriate way to effectuate merger is the entry of a single uniform judgment document memorializing the conviction and sentence for each offense rather than to enter separate judgments for each jury verdict.  That single judgment form should also memorialize the merged jury verdicts.

It has been the typical practice of this court to overlook the entry of separate judgment forms as a means of memorializing the merged guilty verdicts when the forms did not reflect a conviction offense or a sentence; however, separate judgment forms for the subsumed guilty verdicts that express *convictions* and impose sentences should be addressed by this court.  That is what the trial court did in this case.  The court recognized the need for merger, but it entered separate judgments of conviction that imposed sentences for each of the jury verdicts.  In consequence, we must remand the case for the entry of corrected judgment forms that properly effectuate merger.

Upon remand, the trial court shall:

1.  Enter a single judgment of conviction for the offense of first degree murder as to each victim that memorializes the fact that the jury returned verdicts of guilty of seven alternative counts of felony murder and one alternative count of premeditated murder and that contains the sentence of death.[13]

2.  Enter a single judgment of conviction for the offense of especially aggravated kidnapping as to each victim that memorializes the subsumed jury verdict of guilty of especially aggravated kidnapping.

3.  Enter a single judgment of conviction for especially aggravated robbery as to each victim that also reflects the jury verdict of guilty of theft because theft is a lesser

---

[13]Despite that the jury actually returned verdicts of guilty on eight alternative counts of felony murder as to each victim, the State dismissed one of the counts alleging felony murder as to each victim following the jury verdicts.

included offense of robbery.

       4. Enter a single judgment of conviction for the aggravated anal rape of C.C., a single judgment of conviction for the aggravated oral rape of C.C., and a single judgment of conviction for the aggravated vaginal rape of C.C., *see, e.g.*, *State v. Kendrick*, 38 S.W.3d 566, 569 (Tenn. 2001) (approving separate convictions of rape for the unlawful sexual penetration of the different parts of the victim's body). Each judgment should reflect that the jury returned guilty verdicts on the other counts charging the aggravated rape of C.C.

       5. Enter a single judgment of conviction for the facilitation of the aggravated rape of C.N. that reflects the merged jury verdicts of guilty of that same offense.

       6. Vacate the previously entered judgment forms for the merged offenses.

*Conclusion*

       Based upon the foregoing, we hold as follows:

       1. Because our supreme court has previously concluded that the trial judge's out-of-court misconduct did not affect the integrity of the defendant's trial, this court is prohibited from addressing the defendant's claim of structural error.

       2. Because the affidavit in support of the first warrant to search the Chipman Street residence was unsigned, that warrant was invalid as a matter of state law. Admission of the evidence obtained during the execution of that warrant, however, is permissible pursuant to the inevitable discovery doctrine. Although the affidavit in support of the second search warrant contained tainted information obtained during the first, illegal search, the second search warrant is nevertheless valid because, after the tainted information is excised, the affidavit still expresses probable cause to support the issuance of the warrant. Under these circumstances, the trial court did not err by denying the defendant's motion to suppress evidence seized from the Chipman Street residence.

       3. The trial court did not err by refusing to suppress the defendant's pretrial statement to the police because the defendant's arrest was based upon probable cause. The defendant's subsequent waiver of his constitutional rights to remain silent and to counsel was valid, and the record supports a conclusion that his statement was voluntarily given.

       4. The trial court did not err by refusing to suppress the results of DNA testing performed on samples obtained via searches of the defendant's person because the testing was so attenuated from the taint of the initial illegal entry of the Chipman Street residence

that its inclusion in the warrants for the search of the defendant's person did not invalidate either warrant and because the warrants contained probable cause for the search of the defendant's person even without the tainted information.

5. The trial court did not err by admitting into evidence post-mortem photographs of the victims because the photographs, though graphic, were not so shocking or gruesome that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. Instead, the photographs accurately illustrated for the jury the nature and circumstances of the crimes committed against C.N. and C.C. The trial court also did not err by refusing to grant a mistrial after a member of the district attorney general's staff fainted during the presentation of the photographs because the trial court issued a curative instruction following the unintended and unanticipated event.

6. The trial court did not err by admitting testimony regarding fingerprint identification because Messrs. Crenshaw and Schade qualified as experts in the field, fingerprint evidence is not so unreliable that expert testimony about fingerprint identification should be excluded from evidence, and the trial court allowed the defendant to cross-examine the witnesses regarding the ACE-V method of fingerprint analysis and its application in this case.

7. The trial court did not err by admitting evidence of the ballistics testing conducted in this case because Ms. Resig's testimony established that she was qualified to offer expert testimony on this topic and that the methods she used in this case were those widely accepted within the scientific community.

8. The trial court did not err by permitting the immediate family members of the victims to wear buttons displaying photographs of the victims. The trial court carefully crafted and strictly enforced a rule designed to limit the impact of the buttons on the defendant's right to a fair trial, and no evidence indicated that the presence of the buttons prejudiced the defendant.

9. Because the record contains no evidence to suggest that the State's unintentional interception of the defendant's correspondence with his counsel, though erroneous, resulted in any prejudice to the defendant, the trial court did not err by denying the defendant's motion to dismiss the presentment following the interception of this privileged communication.

10. The second successor judge did not err by concluding that he could fulfill the role of thirteenth juror in this case because thirteenth juror review of the evidence did not require "an assessment of witness demeanor." To the contrary, the evidence indisputably

established that the victims were kidnapped, robbed, raped, tortured, and murdered, and the physical evidence tied the defendant inextricably to those crimes.

11. The evidence adduced at trial was more than sufficient to support the defendant's convictions. The record establishes that the victims were kidnapped from the parking lot of the apartment complex where the couple were preparing for an evening out. The next day, authorities discovered C.N.'s partially burned body on the railroad tracks near the Chipman Street residence; he had been beaten, raped, forced to walk barefoot over gravel to the site of his execution, and shot three times. C.C.'s body was later discovered inside the defendant's Chipman Street residence stuffed inside a trash can; she had been beaten and raped before being stuffed, still alive, into five trash bags and then the trash can. The defendant's fingerprints were found inside C.C.'s 4Runner and on some of the bags used to contain her body. DNA analysis established the presence of the defendant's semen in C.C.'s vagina and rectum and on her blue jeans. Mr. Cobbins' DNA was found in C.C.'s mouth and on her tank top, sweater, and blue jeans and on the floral fabric used to bind C.C. Items belonging to both victims, including C.C.'s 4Runner and C.N.'s shoes, were seen in the defendant's possession or found inside the Chipman Street residence.

12. The trial court did not err by refusing to dismiss the presentment on grounds that it was constitutionally insufficient because the presentment included a date, description, and appropriate statutory reference for each offense charged. The failure to include a specific charge of criminal responsibility did not render the presentment deficient because no such charge is required.

13. The trial court did not err by denying the defendant's pretrial motion to prohibit the jurors from submitting questions. Tennessee Rule of Criminal Procedure 24.1 specifically allows the trial court to permit jurors to submit questions, and the trial court in this case followed the procedure set forth in the rule for the handling of juror questions during the trial.

14. The trial court should not have required the jury to review the video recording of the defendant's pretrial statement in open court during its deliberations but instead should have allowed the jury to operate the equipment in the courtroom on its own. The error was harmless, however, because the record contains no evidence that this procedure prejudiced the defendant.

15. The defendant failed to establish that the procedure for filling the jury pool in this case violated his constitutional right to an impartial jury selected from a fair cross-section of the community. Additionally, our supreme court has specifically approved the selection method utilized in this case.

16.  The trial court did not err by refusing to allow the defendant to present evidence of the economic costs associated with implementing the death penalty in Tennessee versus imposing a sentence of life without parole because that evidence was irrelevant.  The authority to determine whether the benefits of retaining the death penalty outweigh the costs associated with implementing it lies solely with the legislature.  Relatedly, that the economic costs of the death penalty are high does not render it unconstitutional.

17.  The trial court did not err by seating only "death qualified" jurors because our supreme court has repeatedly approved of the process of death qualifying the jury.

18.  Neither Tennessee's death penalty scheme, including lethal injection, nor its application in this case is unconstitutional.

19.  The trial court did not err by permitting the State to present victim impact evidence during the penalty phase.

20.  Following our review as mandated by Code section 39-13-206, we conclude that the death penalty was not imposed in an arbitrary manner in this case; that the evidence supports the jury's finding of the aggravating circumstances beyond a reasonable doubt and the jury's finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt; and that the death penalty imposed in the present case is not excessive or disproportionate to the penalty imposed in other cases.

21.  The trial court's attempted merger of the offenses as required in this case was ineffectual, and as a result, the case must be remanded for the entry of corrected judgments as set forth more explicitly above.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE